884 A.2d 1171

**Derek T. HARVEY**

v.

**Robin Laverne MARSHALL, et al.**

**No. 109, Sept. Term, 2004.**

Court of Appeals of Maryland.

Oct. 14, 2005.

248

Daniel L. Hatcher (University of Baltimore School of Law, Civil Advocacy Clinic; Hannah Lieberman of the Legal Aid Bureau, Inc., Baltimore), on brief, for Petitioner.

Beth Mellen Harrison, Francis D. Murnaghan, Jr., Appellate Advocacy Fellow, Baltimore, brief of Petitioner Amicus Curiae, the Public Justice Center.

Joseph B. Spillman, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of MD, Baltimore), on brief, for Respondents.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

HARRELL, Judge.

This case arises from attempts by Derek T. Harvey, a father who reunited with four of his children, to have a Maryland court extinguish, or, in the alternative, direct the Child Support Enforcement Administration ("CSEA") to forgive, child support arrearages he owes that accumulated before he obtained custody of the children. In resolving this case, we are called upon to examine whether a court may eliminate completely child support arrearages in light of the statutory prohibition on the retrospective modification of child support orders. We also must determine whether the CSEA is bound to apply the familiar "best interests of the child" standard in deciding, pursuant to its statutory discretion, whether to forgive child support arrearages, and whether the agency's refusal to exercise that discretion in the father's favor, because of financial and administrative considerations affecting the State's child welfare program, was "arbitrary or capricious."

## I.

Derek T. Harvey obtained physical custody of his three youngest children, Dereka, Robin, and Derek, Jr., when they came to live with him in Baltimore City in the fall of 1996 after their mother became unable to care properly for them. Later that year, Harvey's eldest daughter, Keawoni, came to live with him due to the death of her mother and the subsequent inability of her grandparents to care for her. At the same time, Harvey also opened his household to Keawoni's half-sister, Kelly Williams.

Harvey's child support obligations arose from consent paternity decrees issued by the Circuit Court for Baltimore City in 1986 and 1989 establishing Harvey as the biological father of

the pertinent children.[1] Prior to Harvey gaining custody of the children, Robin Laverne Marshall, the mother of Dereka, Robin, and Derek, Jr., applied for welfare assistance because she was not receiving the child support Harvey was ordered to pay. As a condition of receiving welfare assistance, Ms. Marshall was required to initiate child support proceedings and assign the children's support rights to the State.[2] Rita Williams, the mother of Keawoni, also assigned her child support rights to the State as a condition of receiving welfare assistance. During the period the children were in the custody of their mothers, Harvey accumulated significant child support arrearages as the result of his nonpayment of the court-ordered child support.

Soon after the children joined his household, Harvey, on several occasions, informed officials at the Baltimore City Office of Child Support Enforcement ("BCOCSE") that the children were now in his physical custody. At all times relevant to these proceedings, BCOCSE was operated by MAXIMUS, Inc. ("MAXIMUS"), a private corporation under contract with the CSEA.[3] Harvey hoped that by notifying BCOCSE of this change in custody, he might persuade BCOCSE to close his child support cases and forgive his accumulated arrearages. Harvey's informal attempts, however, met with no success. After one meeting with a case

---

1. The 1986 and 1989 consent paternity decrees established Harvey as the biological father of only his three youngest children. Even though child support obligations were pursued with regard to his oldest daughter, Keawoni, the record does not include a paternity decree or court file number relating to her case. Neither party, however, disputes that Harvey is the biological father of Keawoni or that he was responsible for supporting her.

2. The requirement that a welfare recipient assign his or her right to receive child support to the State as a condition of receiving welfare assistance is imposed by statute. Md. Code (1957, 2003 Repl. Vol.), Art. 88A, § 50(b)(2).

3. Although Harvey actually interacted with personnel employed by MAXIMUS, for purposes of clarity, when referring to MAXIMUS in its management capacity as BCOCSE, we shall refer to the entities as BCOCSE.

manager in July 2000 at the offices of BCOCSE, in which Harvey once again explained the changed circumstances with regard to his children, he allegedly was informed by the case manager "that the situation would be taken care of." Despite this assurance, BCOCSE continued to enforce Harvey's child support obligations, charging him for his current support, reporting his alleged arrearages to credit reporting agencies, and intercepting several of his tax refund checks.

Also in July 2000, Harvey approached the Baltimore City office of the Legal Aid Bureau, Inc. ("Legal Aid") seeking assistance with regard to his attempts to reduce or eliminate his child support obligations and arrearages. In the spring of 2001, with the assistance of Legal Aid, Harvey was successful in diverting his then-ongoing child support obligation toward his arrearages. Harvey, however, continued to encounter difficulties from BCOCSE in achieving forgiveness of his arrearages.

Frustrated with BCOCSE, Harvey switched his focus to the CSEA, BCOCSE's parent agency. In a 4 June 2001 letter, Legal Aid made a formal request to the CSEA for "forgiveness or abatement" of Harvey's arrearages and current support obligations. The letter advised the CSEA that, as of May 2001, Harvey owed approximately $32,000 in two cases, of which all but $1600 was owed to the State. Legal Aid argued that, although the funds sought by BCOCSE would be used to reimburse the State for past welfare support of the affected children, the current and future best interests of Harvey's children would be served by allowing Harvey to apply current and future income, including $57 subtracted from his paycheck each week, to the future support and upbringing of his children now in his custody.

In a 6 July 2001 letter, Teresa L. Kaiser, executive director of the CSEA, informed Legal Aid that the CSEA would consider exercising its statutory discretion to eliminate or reduce Harvey's child support arrearages owed to the State. The letter, however, stated that, in order to do so, Harvey would need to provide BCOCSE with evidence confirming the length of his physical custody of the children. In response,

Harvey provided documentation, including school records and documents relating to an investigation of Ms. Marshall for fraudulent receipt of welfare benefits, establishing that the children had lived with him since 1996. Harvey also procured and delivered to BCOCSE a court order, issued 20 November 2001 by the Circuit Court for Baltimore City, granting him legal custody of the four children, and made retrospectively effective as of 1 October 1996. The order also terminated Harvey's ongoing child support obligations and eliminated any arrearages accruing after 1 October 1996.

In a memorandum, dated 6 March 2002, to Dwayne Brown, project director of BCOCSE, Ms. Kaiser acknowledged receipt of the 20 November 2001 court order and proposed that BCOCSE take the following actions with regards to the enforcement of the arrearages owed by Harvey:

1. Collect $1.00 per year on the arrears of $5,421.26 [4];

2. Suspend the interception of State and Federal Income Taxes and other enforcement measures except for the Maryland Lottery until:

a) all the children are emancipated,

b) the non-custodial parent begins to pay child support; or

c) the arrears are paid completely by interceptions received through the Maryland Lottery Office;

3. Enter a narrative into the Case Action Logs stating why enforcement in this case was suspended; and

4. Refund State and Federal taxes that were intercepted.

---

4. The Court of Special Appeals, in its opinion in this case, relied on this figure as the total amount of arrearage owed by Harvey. The CSEA arrived at this figure as the result of an audit of Harvey's child support case, numbered by BCOCSE as 320021417, taking into account the court order terminating the accrual of his obligations as of 1 October 1996. Correspondence from BCOCSE to Legal Aid, however, indicated that, as of the time of the proceedings in the Circuit Court, Harvey owed child support arrearages of more than $5,000 on an additional account, numbered 610021258. Based on the record, it appears that case 320021417 included arrearages owed for his children born to Ms. Marshall, with case 610021258 representing child support owed for Keawoni.

Ms. Kaiser also instructed Mr. Brown in this memorandum that he would "need to write a letter to the Legal Aid Bureau, Inc. with a summary of the actions outlined above [and that he should] contact [Kaiser] to confirm these arrangements or to discuss other satisfactory arrangements." BCOCSE, however, objected to Ms. Kaiser's proposal, and neither the CSEA nor BCOCSE took any further action on Harvey's requests.[5]

Meeting no success in his initiatives with BCOCSE or the CSEA, Harvey filed in the Circuit Court for Baltimore City on 17 May 2002 a Motion to Set–Aside Child Support.[6] By this time, Harvey had remarried, adding his new wife and her son to his household. In his motion, Harvey asked the court to set aside his child support arrearages under the authority of Md. Code (1974, 2004 Repl. Vol.),[7] § 5–1038(b) of the Family Law Article,[8] which he argued permits a court to modify or set aside a child support order if the court finds that such an action is "just and proper in light of the circumstances and in the best interests of the child." Harvey also asked the court, in the alternative, to find that the CSEA declined improperly to forgive his arrearages under § 10–112, which grants discretion to the CSEA to settle past child support arrearages for less than the full amount.

At a merits hearing on the motion held on 25 October 2002, Rachelle Langdon, a manager for BCOCSE, testified that, in regard to the proposal by Ms. Kaiser,

---

**5.** The record indicates that, pursuant to the CSEA's requests, BCOCSE returned Harvey's previously intercepted tax refund checks for 2001.

**6.** Although Ms. Marshall is a named party to this case, she is only a nominal party due to her assignment of her child support rights to the CSEA as a condition of receiving welfare assistance. The CSEA and BCOCSE ultimately became third-party defendants.

**7.** We assume that, in his 2002 motion, Harvey's statutory references were to the 1999 replacement volume of the Family Law Article, which, in regard to the statutes relevant to this matter, are identical to those in the 2004 replacement volume.

**8.** Unless otherwise indicated, all subsequent statutory references in this opinion should be understood to be to the Family Law Article.

... I believe my supervisor, Mr. Drummond discussed this at one of our bi-weekly meetings, basically stating that we didn't agree with this proposal because: (1) our computer systems are not set up to read anything like this, which means that if you have $5,000.00 on the system, we don't really have much of a way to monitor these cases to make sure his taxes are intercepted or not you know turned into the credit agency. We have a lot of automated systems that are in place[.]

Ms. Langdon also testified that BCOCSE did not want to take the action proposed by Ms. Kaiser because to do so "would potentially harm the numbers that show the local enforcement office's collection rate."

At the hearing, Harvey testified that he supported his children and extended household on wages of $10.96 an hour as a landscaper for the City of Baltimore. Harvey claimed that the existence of unpaid child support obligations affected adversely his credit rating, prevented him from purchasing or financing a home, and undermined his ability to pay and save for his children's education. All of these consequences of continued enforcement, Harvey argued, acted as a detriment to the best interests of his children and thus provided a justification for the complete elimination of his arrearages.

After hearing arguments from counsel, the Circuit Court, in an order dated 8 May 2003, denied Harvey's motion to set aside child support arrearages. Harvey appealed to the Court of Special Appeals, which affirmed the Circuit Court's denial of his motion. In its reported opinion, the intermediate appellate court held that, although § 5–1038(b) appeared to grant a court authority to set aside a child support order, it conflicted with and was superceded by § 12–104, which prohibited the retrospective modification of a child support order prior to the filing of a motion for modification. *Harvey v. Marshall*, 158 Md.App. 355, 363, 857 A.2d 529, 534 (2004). The court also held that the CSEA did not abuse its discretion under § 10–112 by failing to act on Harvey's request to forgive his arrearages. *Id.* at 382, 857 A.2d at 545. Harvey petitioned for a writ of certiorari in this Court, which we

granted, 384 Md. 448, 863 A.2d 997, in order to consider the following questions:

I. Did the Court of Special Appeals err in holding that the Circuit Court had no discretion to retrospectively extinguish a child support award prior to the date of the filing of a motion for modification?

II. Did the Court of Special Appeals err in holding that the CSEA did not act in an arbitrary, illegal, capricious or unreasonable manner when it refused to exercise its discretion under § 10–112 to forgive Harvey's child support arrearages?

## II.

Harvey argues that the Circuit Court erred when it found that it did not possess discretion under § 5–1038(b) to eliminate Harvey's child support arrearages accruing prior to the filing of his motion. Sec. 5–1038, in context, states:

**Title 5. Children.**

\* \* \*

**Subtitle 10. Paternity Proceedings.**

\* \* \*

**Part VI. Court Order.**

\* \* \*

**§ 5–1038. Finality; modification.**

(a) *Declaration of paternity final; modifications.*—(1) Except as provided in paragraph (2) of this subsection, a declaration of paternity in an order is final.

(2)(i) A declaration of paternity may be modified or set aside:

1. in the manner and to the extent that any order or decree of an equity court is subject to the revisory power of the court under any law, rule, or established principle of practice or procedure in equity; or

2. if a blood or genetic test done in accordance with § 5–1029 of this subtitle establishes the exclusion of the individual named as the father in the order.

(ii) Notwithstanding subparagraph (i) of this paragraph, a declaration of paternity may not be modified or set aside if the individual named in the order acknowledged paternity knowing he was not the father.

(b) *Other orders subject to modification.*—Except for a declaration of paternity, the court may modify or set aside any order or part of an order under this subtitle as the court considers just and proper in light of the circumstances and in the best interests of the child.

The CSEA and BCOCSE counter that the discretion conferred upon a court by § 5–1038(b) conflicts with and is limited by the more specific pronouncements in § 12–104, which state, in context:

**Title 12. Child Support.**

\* \* \*

**Subtitle 1. General Provisions.**

\* \* \*

**§ 12–104. Modification of child support award.**

(a) *Prerequisites.*—The court may modify a child support award subsequent to the filing of a motion for modification and upon a showing of a material change of circumstance.

(b) *Retroactivity of modification.*—The court may not retroactively modify a child support award prior to the date of the filing of a motion for modification.

Harvey continues by maintaining that the Court of Special Appeals erred in concluding that, as applied to his case, the specific prohibition in § 12–104 on retrospective modification conflicts with the wide discretion contained in § 5–1038(b). He argues that, because he seeks to eliminate completely his past arrearages, he is not requesting a "modification" of his obligations, but rather a "set aside." Harvey's theory relies heavily on the fact that, although § 5–1038(b) permits a court to "modify or set aside any order," the language in § 12–104 only limits a court's discretion to "modify" a child support award retrospectively. He posits that the absence in § 12–104 of a limitation on a court's discretional authority to "set aside"

an order is a clear and conspicuous indication that § 12–104 does not limit a court's authority, under § 5–1038(b), to eliminate completely his arrearages accruing before the filing of his motion. We do not agree with his interpretation.

## A.

### 1.

Harvey's question is one of statutory interpretation and, as such, is purely a legal one. *Mohan v. Norris*, 386 Md. 63, 66–67, 871 A.2d 575, 577 (2005). We therefore review the matter *de novo*. *Id*.; *see also Davis v. Slater*, 383 Md. 599, 604, 861 A.2d 78, 80–81 (2004) (stating that "[b]ecause our interpretation of . . . provisions of the Maryland Code . . . are appropriately classified as questions of law, we review the issues *de novo* to determine if the trial court was legally correct in its rulings on these matters").

### 2.

The CSEA and BCOCSE argue, as a preliminary matter, that Harvey's claim is foreclosed by claim preclusion principles because he "previously sought relief from his responsibility to pay past due child support based on exactly the same factual circumstances that form the basis of his claims in the present proceeding; that he has had actual physical custody of his children since 1996." [9] Respondent's Brief at 6. The CSEA, however, ignores the fundamental purpose and nature of § 5–1038(b), which relaxes with regard to certain

---

9. The CSEA does not make clear whether it is claiming that the doctrine of *res judicata* bars Harvey's action with regard to a court's discretion to eliminate completely his arrearages under § 5–1038(b), with regard to judicial review of the CSEA's refusal to exercise its discretion under § 10–112, or both. Because, at the time of the relevant 20 November 2001 court order, the CSEA had not made yet the decision not to exercise its discretion in Harvey's favor (and therefore a cause of action did not yet exist), we shall consider CSEA's argument only with respect to a court's ability to eliminate completely his arrearages under § 5–1038(b).

orders in paternity cases the ordinary rules of finality of judgments.

We conclude that the doctrine of *res judicata* does not bar the present case because Harvey's motion seeking to establish custody of his children did not present the same claim or cause of action as the present case. *See Lizzi v. Washington Metro. Area Transit Auth.*, 384 Md. 199, 206–07, 862 A.2d 1017, 1022 (2004) (stating that *res judicata* "bar[s] the same parties from litigating a second lawsuit on the same claim, or any other claim arising from the same transaction or series of transactions and that could have been—but was not—raised in the first suit" (citations omitted)). On 29 March 2001, Harvey filed a motion in the Circuit Court for Baltimore City in the underlying paternity cases, setting forth the basic facts of his reunification with his children and asking for the following relief:

A. That he be awarded immediate custody of the minor children . . . dating back to October 1996;

B. That Defendant be awarded the permanent care and custody of the children; [and]

C. That Defendant be awarded such other and further relief as the nature of his cause may require.

Although Harvey experienced some resistance from the Baltimore City Department of Social Services in obtaining documents relating to his claims, Ms. Marshall, the mother of three of the children and the putative plaintiff, did not oppose the relief requested.[10] As indicated *supra*, the Circuit Court granted Harvey custody of all four of his biological children, effective 1 October 1996. The court also ordered that Ms. Marshall be "charged generally for the support and maintenance of [the children she had with Harvey]." Finally, the court directed that Harvey's child support obligations for his children be terminated, also effective 1 October 1996 (meaning

---

**10.** Although the CSEA, in its brief, stated that it also did not oppose the relief sought by Harvey, the record does not reveal the extent of direct or indirect involvement, if any, of the CSEA in Harvey's attempts to establish legal custody of his children in that proceeding.

for child support attributable to and accruing from that date forward).

The record reveals that Harvey's purpose in asking the court to award him custody of his children was to establish a foundation to pursue forgiveness of his arrearages from the CSEA under the statutory scheme in § 10–112. There is no indication that Harvey asked the court, at that time, to exercise its discretion under § 5–1038(b) to eliminate or modify his arrearages that accrued prior to 1 October 1996. Had Harvey sought retrospective modification (i.e., elimination) of his past child support obligations for the period before he gained custody, he theoretically would have encountered the same obstacle as he has in the present case—the limitations on retrospective modification contained in § 12–104. Confronted with only a request for a retrospective child custody determination, the Circuit Court awarded Harvey only that relief that was a direct consequence of a finding of retrospective custody, including a "credit" or "offset" of child support payments that he was to have paid during that period. *See Child Support Enforcement Admin. v. Shehan*, 148 Md.App. 550, 562, 813 A.2d 334, 342 (2002) (finding that, because, under § 12–204(*l*)(2), "[t]he custodial parent shall be presumed to spend that parent's total child support obligation directly on the child . . .," a parent that had reunited with his family and became the custodial parent was entitled to a credit of the payments made during the period since he became a custodial parent). A motion, pursuant to § 5–1038(b), seeking elimination of arrearages accruing during a non-custodial period of time is not, for *res judicata* purposes, the same claim as a motion to establish custody retrospectively, and simply was not litigated in the 2001 proceeding.

3.

Next, we consider whether the prohibition on retrospective modification of child support orders (for non-custodial periods of time) in § 12–104 was intended as a limitation on the broad authority conferred upon a court by § 5–1038(b), and, if so, the extent of that limitation. Our starting point is

the plain language of the two statutes. *See Johnson v. Mayor of Baltimore,* 387 Md. 1, 11, 874 A.2d 439, 445 (2005).

Harvey observes correctly that, although § 5–1038(b) provides authority for a court to both "modify or set aside" *any* order in paternity actions (other than a declaration of paternity), § 12–104 merely limits a court's discretion to "modify," retrospectively, a child support order. Harvey continues, however, that, although the statutes use similar language, there is a substantive difference between a court's authority to "set aside" a child support order and a court's authority to "modify" retrospectively such an order. In order to grant Harvey the relief he requests, therefore, a court must be convinced that an action to eliminate retrospectively and completely child support arrearages should be classified properly as a "set aside," governed by § 5–1038(b), rather than a "modification," governed by § 12–104. The CSEA responds that the Legislature's use of the term "modify" in § 12–104 was intended, as a matter of both legislative intent and common sense, to include those actions covered by any definition of "set aside," and thus the distinction sought by Harvey is irrelevant. Thus, proper analysis, as we perceive it, hinges on interpretation of the term "modify" in § 12–104, and specifically whether the use of that term encapsulates the complete elimination of a child support arrearage—the relief that Harvey requests.

Although the terms "modify" and "set aside" are not defined in either of the respective subtitles that contain the relevant statutes, these terms (or similar terms) are addressed in Black's Law Dictionary. The fifth edition of Black's Law Dictionary,[11] published contemporaneously with the enactment

---

11. Although appellate courts frequently consult and rely on dictionary definitions in their analysis of statutory language, often without explanation for why a particular dictionary was consulted, the question as to which edition of a particular dictionary is utilized in a given situation presents a more puzzling inquiry. Sometimes it seems that random chance is determinative, based on whatever edition is on a library shelf within reach of the author at the time of composition of the opinion. Because we are attempting to ascertain the intent of the Legislature in

of § 12–104 in 1988, defines "modify" as: "To alter; to change in incidental or subordinate features; enlarge, extend; amend; limit, reduce. Such alteration or change may be characterized, in quantitative sense, as either an increase or decrease." Black's Law Dictionary 905 (5th ed. 1979). Applying the appropriate senses of the word, one might conclude that the prohibition on retrospective modification of child support awards in § 12–104 would preclude the retrospective elimination of arrearages. Even if the relief Harvey requests also was defined as a "set aside," such an action arguably would involve "modifying" a child support order because, not only would a complete elimination of arrearages be, in relatively broad terms, an "alteration" or "change" to a child support award, but, in more specific terms, it would certainly be a "limitation" or "reduction" of such an order.

Harvey, however, in arguing that there is a substantive distinction between "modify" and "set aside," points us toward the definition of "modification." The fifth edition of Black's [12] defines "modification" as "[a] change; an alteration or amendment which introduces new elements into the details, or

choosing certain language at a point in time, resort to a dictionary, legal or otherwise, should logically include consultation of those editions (in addition to current editions) of dictionaries that were extant at the time of the pertinent legislative enactments. *See Rossville Vending Mach. Corp. v. Comptroller of Treasury,* 97 Md.App. 305, 316–18, 629 A.2d 1283, 1289–90 (1993) (stating that "[i]t seems logical, at least in a linear way, that a popular dictionary of [the time in which a statute was enacted] would be an informative resource in attempting to arrive at a determination of what the 1936 Legislature intended by the usage of 'gross receipts' ").

**12.** Harvey, in his brief, actually points us towards the definition of "modification" found in a printing of the fourth edition of Black's Law Dictionary published in 1968. Petitioner's Brief at 41. This definition is substantively indistinguishable from the definition found in the fifth edition. Harvey gives us no indication as to why he chose to rely on the fourth edition of Black's, nor does he make mention of the definition of "modify" in either edition. We note, however, that, although the definition of "modify" in the fourth edition of Black's is near identical to the definition of "modify" in the fifth edition, the eighth (and current) edition of Black's does not contain an entry or definition for "modify," instead including only a definition for "modification."

cancels some of them, *but leaves the general purpose and effect of the subject-matter intact.*" (Emphasis added).[13] Black's Law Dictionary 905 (5th ed. 1979). Harvey asks us to compare this definition with that of "set aside," which is defined by the fifth edition[14] of Black's as "[t]o reverse, vacate, cancel, annul, or revoke a judgment, order, etc." *Id.* at 1230. Harvey proclaims that, under these definitions, the complete elimination of child support arrearages would not be a "modification," because it would not "leave[ ] the general purpose and effect of the subject-matter [of the child support order] intact," but would instead "cancel, annul, or revoke" an obligation to pay child support. Harvey's interpretation, if accepted, would have the result of the relief he requests skirting the limitation on retrospective modifications in § 12–104 and placing it within the broad remedial authority of § 5–1038(b).

We agree with Harvey that there is a substantive distinction, at least with regard to child support and paternity matters, between a "modification" and a "set aside." Despite this, we conclude that the relief Harvey seeks, in fact, is

---

**13.** The eighth edition of Black's presents a similar, yet remarkably modified, definition of "modification": "1. A change to something: an alteration <a contract modification> . . . . 2. A qualification or limitation of something <a modification of drinking habits> . . . ." Black's Law Dictionary 1025 (8th ed. 2004). The editors give no indication as to why any language regarding "leav[ing] the general purpose and effect of the subject-matter intact" was removed.

**14.** Because § 12–104 does not address a "set aside," it may be appropriate to examine a definition of "set aside" from a dictionary published contemporaneously with the enactment of the language found in § 5–1038(b). As indicated *infra*, that particular language was enacted in 1963. 1963 Md. Laws, Chap. 722. The fourth edition of Black's dictionary, published in 1951, defines "set aside" as "[a] judgment, decree, award, or any proceedings . . . to cancel, annul, or revoke them at the instance of a party unjustly or irregularly affected by them." Black's Law Dictionary 1537 (4th ed. 1951). We find that such a definition, however, is, for purposes of this case, substantively indistinguishable from the definition of "set aside" in the fifth edition. We note also that the eighth (and current) edition of Black's provides a similar definition of "set aside": "(Of a court) to annul or vacate (a judgment, order, etc.) <the judge refused to set aside the default judgment> . . . ." Black's Law Dictionary 1404 (8th ed. 2004).

defined more properly as an effort to "modify" his child support arrearages, rather than as an action to "set aside." *Cf. Morton County Soc. Serv. Bd. v. Hakanson,* 660 N.W.2d 599, 601 (N.D.2003) (finding that, when a child support judgment is filed in a court solely for the purposes of enforcement of that order, that court may not forgive child support arrearages because, "[i]f a court forgives past due child support obligations, it has modified a child support order"); *Gilbertson v. Graff,* 477 N.W.2d 771, 774 (Minn.Ct.App.1991) (finding that "[f]orgiveness of unpaid child support is a retroactive modification of child support governed by [the Minnesota statute prohibiting the retroactive modification of child support orders]"); *cf. Schulz v. Ystad,* 155 Wis.2d 574, 456 N.W.2d 312, 320 (1990) (finding that a Wisconsin statute prohibiting the retrospective "revision" of child support orders "eliminated the long-standing power of the Wisconsin courts to modify, reduce, or forgive accumulated support arrearages"). Harvey's child support obligations and arrearages arose from paternity decrees, issued by a court, that included awards for child support. In asking the court to eliminate completely his arrearages, Harvey does not do so by challenging the underlying validity of the child support awards. Harvey's motion therefore does not seek to "set aside" or invalidate his child support obligations, but relates rather to a modification with respect to the enforcement of those remaining, valid portions of his child support obligations as they affect his current and future ability to support his family. Had the underlying child support award been invalid, there would be clear authority for a court to "set aside" the award retrospectively, even in light of the statutory language in § 12–104. *See Walter v. Gunter,* 367 Md. 386, 395, 788 A.2d 609, 614 (2002) (finding that a court has no discretion, under either § 12–104 or § 5–1038(b), "to 'modify' a child support order which is based on a vacated paternity judgment because the order itself is inextricably linked to the paternity declaration, its viability . . . absolutely dependent on the viability of the paternity declaration"). Because Harvey's "motion to set aside" instead asks for an alteration to or limitation on only that portion of the award

that is affected by his current circumstances, it should be deemed therefore a "motion for modification." Thus, although § 5–1038(b) seemingly would permit the retrospective modification, i.e. complete elimination, of Harvey's arrearages, its broad language, as applied in the present case, conflicts clearly with the limitation on retrospective modification in § 12–104.

4.

This conclusion finds support in the legislative history of § 12–104. The limitations on retrospective modification of child support awards found in § 12–104 were enacted by the General Assembly in 1988 in response to a federal stimulus to the States regarding their enforcement of child support awards. 1988 Md. Laws, Chap. 338. In her statement before the Maryland Senate Judicial Proceedings Committee on 10 March 1988, Senator Ida G. Ruben (D—Montgomery County), the sponsor of the bill that ultimately became the enacted legislation, explained the underlying issues and policy concerns regarding Maryland's child support enforcement situation:

> As it stands now, a person owing back-child support payments usually has to go back to court and promises to be more timely in the future. Then the judge usually wipes out the previous debt and allows the payor to start anew with child support payments. The result is that thousands of dollars owed to children and their families are lost forever. S.B. 691 [codified ultimately as § 12–104] would end that practice by not allowing the court to retroactively modify a standing decree for child support. Children and their families would be able to get back payments they are owed.

Ann C. Helton, then-executive director of the CSEA, appeared before the Senate Committee to emphasize that the legislation was necessary to prevent courts from forgiving accumulated arrearages:

> As important as collection of these overdue amounts is to families and taxpayers, in many cases judges have ordered

that these arrearages be abated in return for the obligor's promise to remain current in future support payments. Regardless of whether that promise is kept, the overdue amounts have been wiped out .... [§ 12–104] simply prevents the Court from forgiving the debt.

Beyond these financial implications for any State, the federal government identified the retrospective reduction and elimination of child support awards as a significant problem warranting national attention. In 1986, Congress amended Title IV of the Social Security Act, 42 U.S.C. 601 *et seq.* (2005), to require States to conform to national standards with regard to child support payments and enforcement. Omnibus Budget Reconciliation Act of 1986, Pub. L. No. 99–509, § 9103, 100 Stat. 1874, 1973 (1986). This legislation, codified at 42 U.S.C. § 666(a)(9) (2005), provided in part:

(a) ... each State must have in effect laws requiring the use of the following procedures ... to increase the effectiveness of the program which the State administers under this part [42 U.S.C. §§ 651 *et seq.*] ...

\* \* \*

(9) Procedures which require that any payment or installment of support under any child support order, whether ordered through the State judicial system or through the expedited processes required by paragraph (2) [concerning procedures for establishing paternity and for establishing, modifying, and enforcing support obligations], is (on and after the date it is due)—

(A) a judgment by operation of law, with the full force, effect, and attributes of a judgment of the State, including the ability to be enforced,

(B) entitled as a judgment to full faith and credit in such State and in any other State, and

(C) *not subject to retroactive modification by such State or by any other State;*

except that such procedures may permit modification with respect to any period during which there is pending a petition for modification, but only from the date that notice

of such petition has been given, either directly or through the appropriate agent, to the obligee or (where the obligee is the petitioner) to the obligor.

(emphasis added).

Legislation containing the language found in 42 U.S.C. § 666(a)(9) originally was introduced by Senator William W. "Bill" Bradley of New Jersey on 5 May 1986 as S. 2404, and by Representative Barbara B. Kennelly of Connecticut on 7 May 1986 as H.R. 4769. These two bills, however, died in committee. Nonetheless, the amendments codified ultimately as 42 U.S.C. § 666(a)(9) were placed into H.R. 5300, the Omnibus Budget Reconciliation Act of 1986, which was passed by the Congress and signed into law by the President on 21 October 1986. Pub.L. No. 99–509, § 9103, 100 Stat. 1874, 1973 (1986). The legislative history of the two predecessor bills indicates that the main concerns addressed were deficiencies and loopholes affecting the interstate enforcement of child support awards, including the effect of retrospective modification of child support orders. *See* 132 Cong. Rec. 9416–17 (1986) (statement of Sen. Bradley); 132 Cong. Rec. 9958 (1986) (statement of Rep. Kennelly). In her statement in the House of Representatives on 7 May 1986, Rep. Kennelly stated that H.R. 4769 was aimed at States that allowed "[child support] debt to be reduced, *even to the point of wiping out the entire prior obligation.* . . ." 132 Cong. Rec. 9958 (emphasis added). This concern with the ability of States to eliminate completely an obligor's arrearages was also reflected in the published "legislative history" of Public Law 99–509. *See* Pub. L. No. 99–509, 1986 U.S.Code Cong. & Admin.News (100 Stat. 1874), 3607, 3917–18 (stating that Pub.L. No. 99–509 was intended to amend the current law in regard to those States and their courts that have "the authority to reduce or nullify arrearages"); *HHS Rules Proposed on Proscription Against Retroactive Modification of Support Arrears,* 13 Fam. L. Rep. (BNA) 1600, 1601 (Oct. 13, 1987) (same).

The Maryland Legislature understood clearly that significant federal funds were in jeopardy if it did not enact legislation intended to effectuate the child support mechanisms

located in, and defined by, 42 U.S.C. § 666(a)(9). Regarding the federal legislation and its accompanying fiscal incentives, Sen. Ruben stated at the Committee hearings:

> The federal government has recognized [retroactive modification of child support awards] as a national problem and has passed legislation requiring states to conform to national standards in child support payments. S.B. 691 would bring the State of Maryland into conformity with federal law. Presently, Maryland is the *only* state not yet in compliance with federal standards. We are in danger of losing all of our child support funding and federal [Aid to Families with Dependent Children ("AFDC")] payments if we do not come into compliance this session. So you can see that it is imperative that this legislation be passed.... [15]

CSEA Executive Director Helton also recognized that S.B. 691 was designed to conform Maryland law to federal mandates:

> The purpose of SB 691 ... is to prohibit the court from retroactively modifying the amount of a child support order. Federal law enacted in 1986 requires all states to enact such legislation. The intent of Congress was specifically aimed at the practice of some courts to reduce or forgive arrearages.

This history indicates clearly that, in enacting § 12–104, the Maryland Legislature sought to fulfill the purpose of 42 U.S.C. § 666(a)(9) as outlined by Congress. *See* Department of Fiscal Services, Fiscal Note Revised 1988, S.B. 691 (stating that the "Department of Human Resources advises that this bill conforms State practice to federal requirements"); *see*

---

15. In her statements before the Committee, Ms. Helton elaborated on the specific federal threat to funding for Maryland's welfare programs:

> On December 8, 1987, the Director of the Federal Office of Child Support Enforcement officially notified Maryland of his intention to disapprove Maryland's State Plan for Child Support because of our failure to enact the legislation proposed by SB 691. Disapproval of our Plan will result in a total withdrawal of Federal funding for the program ($23.1m) and a possible penalty against our AFDC program of from 1% to 5% of its share of Federal funds ($1.2 to $6m).

*also Langston v. Langston,* 366 Md. 490, 514 n. 11, 784 A.2d 1086, 1099 n. 11 (2001), *abrogated on other grounds, Bienkowski v. Brooks,* 386 Md. 516, 873 A.2d 1122 (2005) (concluding that "[i]t appears that the General Assembly imposed limitations on the modification of child support awards in order to comply with the requirement of the [AFDC]"). We therefore conclude that, in using the term "modify" in § 12–104, the General Assembly intended to reflect and appropriate the language used in 42 U.S.C. § 666(a)(9). Because of the adoption of this identical language in § 12–104, we conclude that the Legislature also intended to adopt the connotation and meaning of the term "modification" as intended by Congress in 42 U.S.C. § 666(a)(9), which included not only a reduction or alteration, but the complete elimination, of child support arrearages. 132 Cong. Rec. 9958 (1986) (statement of Rep. Kennelly); *see also Rutledge v. Barrett,* 802 S.W.2d 604, 605–06 (Tenn.1991) (finding that the "legislative history of [the Tennessee statute prohibiting the retroactive modification of child support orders] reflects the [Tennessee] General Assembly's clear understanding that as a result of legislative action to bring Tennessee law in line with the federal requirement [outlined in 42 U.S.C. § 666(a)(9)], the courts of this state would lose their ability to forgive past arrearages in child support cases ...").

### 5.

Despite this legislative history and purpose, Harvey argues that, by defining "modify" to include the retrospective elimination of arrearages, we would be ignoring our responsibility, under principles of statutory interpretation, to search for and find a harmonious interpretation between two related statutes. *See Pete v. State,* 384 Md. 47, 65–66, 862 A.2d 419, 429–30 (2004) (stating that "various consistent and related enactments, although made at different times and without reference to one another, nevertheless should be harmonized as much as possible" (citations omitted)). When two statutes conflict, by their plain language, however, no harmonious interpretation is possible. In this case, there is a conflict between the statutes

in that § 5–1038(b) seemingly allows a court to eliminate child support arrearages retrospectively, while, as we have concluded, § 12–104 specifically precludes that result.

This conflict becomes even more apparent when we examine the logical consequences of Harvey's interpretation of § 12–104. *State v. Glass*, 386 Md. 401, 410, 872 A.2d 729, 734 (2005) (stating that a court's analysis "must be undertaken from a commonsensical rather than a technical[ ] perspective, always seeking to avoid giving the statute a strained interpretation or one that reaches an absurd result" (citations omitted)); *Price v. State*, 378 Md. 378, 388, 835 A.2d 1221, 1227 (2003) (stating that courts must "avoid constructions that are illogical, unreasonable, or inconsistent with common sense" (citations omitted)). Under Harvey's "harmonious interpretation," § 12–104 would not limit a court's discretion to extinguish retrospectively 100% of a parent's arrearages, because that action would be a "set aside," but that same court would have no discretion to reduce that parent's arrearages by up to 99.99%, because that would be a "modification." Common sense and the legislative history of § 12–104 restrain us from agreeing with such a conclusion. *Cf. In re Trust of Lane*, 323 Md. 188, 192–93, 592 A.2d 492, 494–95 (1991) (finding that "if a court has the power to terminate a trust it necessarily has the power to take less drastic measures and modify that same trust").

Although we conclude that the two statutes conflict with respect to the retrospective modification of child support arrearages, we note that our interpretation of § 12–104 and § 5–1038(b) in this case harmonizes those statutes with the Court's holding in *Walter v. Gunter*. In *Walter*, we held that, when a child support order is premised on an invalid paternity declaration, § 12–104 does not limit a court's discretion to "set aside" that child support order. 367 Md. at 393–96, 788 A.2d at 613–15. Our holding today is consistent with *Walter* in that, by including the complete elimination of child support arrearages within the sphere of § 12–104's prohibition on retrospective modification of child support awards, § 12–104 does not interfere with a court's ability to "set aside" an invalid child support order, while still remaining true to the

legislative purposes espoused by both state and federal law-
makers. Pub.L. No. 99–509, 1986 U.S.Code Cong. & Ad-
min.News (100 Stat. 1874) 3917–18.

### B.

When a court concludes that the provisions of two
statutes conflict, it then must determine which statute controls
the facts before it. We turn now to the principles of statutory
interpretation concerning conflicting statutes.

We often have stated that "[w]here there is a specific
enactment and a general enactment which, in its most compre-
hensive sense, would include what is embraced in the former,
the particular enactment must be operative, and the general
enactment must be taken to affect only such cases within its
general language as are not within the provisions of the
particular enactment." *Dep't of Natural Res. v. France*, 277
Md. 432, 461–62, 357 A.2d 78, 94–95 (1976) (citations and
quotations omitted); *see also Smack v. Dept. of Health and
Mental Hygiene*, 378 Md. 298, 306, 835 A.2d 1175, 1179 (2003)
(stating that when, in the context of statutes within the same
statutory scheme, "two statutes conflict and one is general and
the other specific, 'the statutes may be harmonized by viewing
the more specific statute as an exception to the more general
one' " (citations omitted)). In the present case, we conclude
that the prohibition on retrospective modification in § 12–104
limits a court's broad discretion, under § 5–1038(b), to "modify
or set aside" any order that is in the best interests of the
child.

Sec. 5–1038(b) allows a court in a paternity action to "modi-
fy or set aside any order or part of an order under this
subtitle as the court considers just and proper in light of the
circumstances and in the best interests of the child." This
broad authority, viewed in isolation, would appear to allow the
retrospective modification of a child support order in a pater-
nity action. That action, however, expressly is prohibited by
the more specific and particular provisions of § 12–104. We
therefore give effect to the specific limitations of § 12–104 as a

curb on the broad discretion conferred on the courts by § 5–1038(b). *Smack*, 378 Md. at 306, 835 A.2d at 1179.

We are convinced of the controlling applicability of § 12–104 also as a result of the relative dates of enactment of the two statutes. At the time that § 12–104 was enacted in 1988, § 5–1038(b) long had been part of the Maryland legal landscape. *See* 1963 Md. Laws, Chap. 722 (enacting the standard found in § 5–1038(b)). "In attempting to harmonize [two statutes that address the same subject], we presume that, when the Legislature enacted the later of the two statutes, it was aware of the one earlier enacted." *Ridge Heating, Air Conditioning and Plumbing, Inc. v. Brennen*, 366 Md. 336, 352, 783 A.2d 691, 700 (2001) (citations omitted).

The legislative history reveals that § 12–104 was enacted as a result of financial incentives, contained in federal law, to ensure that child support orders were "not subject to retroactive modification" by any State. *See supra* Section II. A. 4. This purpose of § 12–104 corroborates the presumption that the Legislature was aware of the broad discretion in § 5–1038(b) because, had such discretion not existed, a statute limiting discretion would have been wholly unnecessary.

In light of the legislative history of § 12–104, we not only presume, but find conclusive, the Legislature's awareness of the previously enacted § 5–1038(b) when it enacted § 12–104. The legislative history reveals that, during the formal legislative process, the Legislature was informed that the proposed S.B. 691 was designed to limit the discretion delegated to courts to reduce or eliminate child support arrearages, to the detriment of obligee custodial parents, this State, and other states whose child support orders were not given full faith and credit. *See* Testimony of Senator Ida G. Ruben before the Senate Judicial Proceedings Committee, S.B. 691, 10 March 1988 (stating that "S.B. 691 would end that practice by not allowing the court to retroactively modify a standing decree for child support"). The discretion alluded to, of course, is

none other than the discretion conferred upon the courts by
§ 5–1038(b).[16]

By examining this legislative history, we arrive at the
conclusion that § 12–104 was designed to circumscribe the
broad authority delegated to the courts by § 5–1038(b). Thus,
the limitation on retrospective modification contained in § 12–
104 precluded the Circuit Court from granting Harvey's re-
quest to eliminate completely the child support arrearages he
owed.

---

**16.** Harvey cites a passage from *Jessica G. v. Hector M.*, 337 Md. 388,
400–01, 653 A.2d 922, 928–29 (1995), that he believes supports his
contention that "the revisory power in FL § 5–1038(b) extends to the
entire range of paternity orders [including child support orders], except
for the declaration of paternity itself:"

> In *Tandra S. v. Tyrone W.*, 336 Md. 303, 648 A.2d 439 (1994), we
> construed § (a) of FL § 5–1038, and we held that the statute meant
> exactly what it said, *i.e.*, that, except to the extent that an equity order
> is subject to the revisory power of the court, a declaration of paternity
> in a paternity order is final. In the instant case [involving the ability
> of a court to set aside or modify an order dismissing a paternity
> action], we must construe § (b) of the same statute, and we hold that
> it means what it says, *i.e.*, that *all* paternity orders except declara-
> tions of paternity can be modified or set aside "in light of the
> circumstances and in the best interests of the child." ... Although
> there is virtually no legislative history which would shed light on the
> construction of FL § 5–1038(b), the statute is pellucid; it was obvi-
> ously intended to relax the usual rules of finality for all paternity
> orders except for declarations of paternity contained in a paternity
> order. There would be no reason for FL § 5–1038(b) unless the
> statute was intended to permit a paternity court to modify or set aside
> any prior order where just and proper and in the best interests of the
> child, regardless of the usual rules of finality applicable to non-
> paternity cases. The "orders" to which FL § 5–1038(b) are applica-
> ble would seem to be all inclusive.

Petitioner's Brief at 39–40. While this passage is certainly applicable to
the circumstances of *Jessica G.*, we find that its language is not relevant
to any interpretation of § 5–1038(b) as it affects the application of
§ 12–104. To accept this dicta in *Jessica G.* wholesale that the "or-
ders" to which § 5–1038(b) are applicable are "all inclusive" would
render § 12–104 completely impotent. Harvey concedes that, at the
very least, § 12–104 prohibits the retrospective modification (inserting,
of course, his definition of modification) of child support orders, some-
thing that is clearly in conflict with the language of the passage in
*Jessica G.* We therefore conclude that, although the language in *Jessica
G.* is instructive as to the generally broad scope of § 5–1038(b), it aids

### III.

Harvey also contends that the Circuit Court and the Court of Special Appeals erred in finding that the CSEA's decision not to exercise its discretion under § 10–112 in his favor was not subject to judicial review and that alternatively, if it were, the CSEA's refusal to exercise that discretion to grant his request was not "arbitrary, illegal, capricious or unreasonable." We begin by determining whether a decision not to exercise statutory discretion under these circumstances may be subject to judicial review, and, if so, what standard of review should apply.

### A.

Our analysis begins with the basic premise that, in order for an administrative agency's action properly to be before this Court (or any court) for judicial review, there generally must be a legislative grant of the right to seek judicial review. *See South Easton Neighborhood Ass'n v. Easton,* 387 Md. 468, 476 n. 3, 876 A.2d 58, 62 n. 3 (2005) (observing that the Circuit Court did not possess jurisdiction to exercise appellate review of the Easton Town Council's decision to enact an ordinance closing a street so that public property could be conveyed to a local, non-profit hospital); *Criminal Injuries Comp. Bd. v. Gould,* 273 Md. 486, 500, 331 A.2d 55, 64 (1975) (stating that the "right to an appeal is not a right required by due process of law, nor is it an inherent or inalienable right" and that "[a]n appellate right is entirely statutory in origin and no person or agency may prosecute such an appeal unless the right is conferred by statute"). As Harvey concedes, there was no statutory right of judicial review for CSEA actions under § 10–112 at the time the relevant legal proceedings were initiated in the present case. At the time of the CSEA's consideration of Harvey's request, § 10–222 of the State Administrative Procedure Act ("APA"),

---

little in terms of determining when that broad scope is qualified or narrowed by an exception in a competing statute.

Md. Code (1984, 2004 Repl. Vol.), §§ 10–201 *et seq.* of the State Government Article, did not apply to this situation. Sec. 10–222 of the APA provides, with certain exceptions, that "a party who is aggrieved by the final decision [of an administrative agency] in a contested case is entitled to judicial review of the decision as provided in this section." This section does not apply to a decision by the CSEA not to exercise its discretion to forgive Harvey's arrearages, however, because such a decision is not a "contested case" under the APA. The APA defines a "contested case" as

a proceeding before an agency to determine:

(i) a right, duty, statutory entitlement, or privilege of a person that is required by statute or constitution to be determined only after an opportunity for an agency hearing; or

(ii) the grant, denial, renewal, revocation, suspension, or amendment of a license that is required by statute or constitution to be determined only after an opportunity for an agency hearing.

Md. Code (1984, 2004 Repl. Vol.), § 10–202(d)(1) of the State Government Article. Because § 10–112 did not provide the opportunity or procedure for a hearing before the CSEA, an individual affected by a decision (whether affirmatively made or presumed a denial through non-action) under § 10–112 was not entitled to judicial review under the APA.[17] *See State Dep't of Assessments & Taxation v. Clark,* 281 Md. 385, 395–96, 380

---

17. We note that on 26 May 2005, Governor Robert L. Ehrlich, Jr. signed into law legislation amending § 10–112 to include the following provisions placing the exercise of discretion under § 10–112 within the ambit of the APA:

(B)(2)(i) If the Administration does not accept in full settlement of an arrearage in child support payments an amount that is less than the total arrearage under this subsection, the Administration shall notify the obligor of the decision and of the obligor's right to appeal the decision to the Office of Administrative Hearings.

(ii) An appeal under this subsection shall be conducted in accordance with Title 10, Subtitle 2 of the State Government Article. 2005 Md. Laws, Chap. 595. This provision became effective on 1 October 2005.

A.2d 28, 35 (1977) (finding that the definition of "contested case" in the APA contemplates only those proceedings in which a party is entitled to a hearing in front of the administrative agency); *Maryland Pharmacists Ass'n v. Attorney General,* 115 Md.App. 650, 658, 694 A.2d 492, 496 (1997) (same). Furthermore, as a result of the "entirely discretionary" nature of § 10–112 as it exists here, a decision under that statute does not fall under the "contested case" provision because it does not implicate "a right, duty, statutory entitlement, or privilege of a person that is required by statute or constitution." *Clark,* 281 Md. at 395–96, 380 A.2d at 35; *see infra* note 18 (noting Harvey's lack of a clear right to have his arrearages reduced or forgiven and the lack of a clear statutory duty or obligation on the part of the CSEA to render a decision in Harvey's favor).

### B.

In those circumstances where there is no statutory provision for judicial review, however, this Court "has consistently held that the Legislature cannot divest the courts of the inherent power they possess to review and correct actions by an administrative agency which are arbitrary, illegal, capricious or unreasonable." *Gould,* 273 Md. at 500–01, 331 A.2d at 65 (citations omitted); *see also Heaps v. Cobb,* 185 Md. 372, 379, 45 A.2d 73, 76 (1945) (finding that "[c]ourts have the inherent power, through the writ of mandamus, by injunction, or otherwise, to correct abuses of discretion and arbitrary, illegal, capricious or unreasonable acts; but in exercising that power care must be taken not to interfere with the legislative prerogative or with the exercise of sound administrative discretion, where discretion is clearly conferred" (citations omitted)); *Hurl v. Bd. of Educ.,* 107 Md.App. 286, 304–05, 667 A.2d 970, 979 (1995) (finding a determination of whether the APA conferred judicial review on a particular administrative decision irrelevant in light of the courts' inherent power to review "illegal, unreasonable, arbitrary or capricious administrative action ...").

 Despite this inherent power of limited judicial review, the Court of Special Appeals concluded that Harvey's "complaint [did] not qualify for [such] relief because it is about a **failure or refusal** to take administrative action." [18] *Harvey,* 158 Md.App. at 380, 857 A.2d at 544 (emphasis in original). We disagree, and conclude that a court's inherent power of judicial review, under appropriate circumstances, may reach an administrative agency's inaction as well as its action. *See, e.g., Spencer v. Bd. of Pharmacy,* 380 Md. 515, 527, 846 A.2d 341, 348 (2004) (reviewing, under an "arbitrary or capricious"

---

18. The intermediate appellate court also stated that, "[a]lthough an agency's refusal or failure to make a decision may justify mandamus relief in some instances, ... we do not see how mandamus could be applied to this case." *Harvey,* 158 Md.App. at 380, 857 A.2d at 544. We have recognized that mandamus may be an appropriate avenue of relief when a party is attempting to secure judicial review of an administrative decision where no statutory remedy provides for such review. In *Gould,* we described the nature of mandamus relief:

> [M]andamus, as generally used, is to compel inferior tribunals, public officials or administrative agencies to perform their function, or perform some particular duty imposed upon them which in its nature is imperative and to the performance of which duty the party applying for the writ has a clear legal right.

273 Md. at 514, 331 A.2d at 72. Thus, it appears that the substance of a petition for mandamus involves two complimentary requirements: 1) a clear right on the part of the petitioner to the relief requested, and 2) a clear duty on the part of the administrative agency to perform the particular duty implicated. Harvey, however, has no clear right to have his child support arrearages forgiven under § 10–112. Sec. 10–112 involves the extinguishment or reduction of a legal obligation to pay child support, imposed by a court under circumstances in which Harvey had the opportunity to contest the imposition of such an obligation.

We also note that § 10–112 was enacted in order to allow (as opposed to mandate) the CSEA to forgive child support arrearages in its discretion. There is no duty on the part of the CSEA to reduce or eliminate child support arrearages in any case. Even if the CSEA were to concede that forgiveness in a particular case was within "the best interest of this State," such a finding does not create a legal duty to exercise that discretion in a particular way. Instead, any action taken pursuant to § 10–112 is entirely at the CSEA's discretion, and may not be compelled under a petition for mandamus relief. *See Bd. of Educ. v. Secy. of Personnel,* 317 Md. 34, 46–47, 562 A.2d 700, 706 (1989) (finding that mandamus relief to compel the Secretary of Personnel to issue a declaratory ruling under the Administrative Procedure Act

standard, an administrative agency's decision not to exercise its discretionary power to delegate a case to the Office of Administrative Hearings); *cf. Maryland Comm'n on Human Relations v. Downey Communications, Inc.*, 110 Md.App. 493, 536–37, 678 A.2d 55, 76–77 (1996) (finding that, "if [an] agency fails to act within an appropriate time, the party adversely affected may be entitled to pursue an action for mandamus" (citations omitted)). We refuse to draw a substantive distinction, for the purpose of our examination of whether the present case meets the threshold for the exercise of a court's inherent power of judicial review, between agency action and agency inaction. When an agency, in the face of a formal invocation of its discretion by an affected person coming within the class of persons contemplated by the statute, fails to act on a matter committed to its discretion by that statute, there is as much aggrievement and potential for abuse or prejudice as when an agency affirmatively announces an adverse decision.

 The inherent power of judicial review of administrative decisions, however, is extremely limited.[19] Numerous

---

would be improper because such a decision is "clearly a matter of the agency's discretion").

**19.** A worthy argument can be made (though not mounted by the CSEA in this case) that the CSEA's action (or inaction) is not of the type reviewable by the courts. The Court of Special Appeals, in considering Harvey's argument that the CSEA failed to exercise properly its discretion by failing to act on "his request to forgive state-owed arrears," expressed trepidation as to the ability and scope of a court's review of the type of agency conduct as occurred here, whether via a court's inherent power to review agency actions to prevent "arbitrary, illegal, capricious or unreasonable" administrative action or by mandamus. 158 Md.App. at 380–81, 857 A.2d at 544–45. Despite these reservations, the intermediate appellate court, electing a "belt-and-suspenders" approach in its analysis, reached the merits of Harvey's argument insofar as it was argued that the CSEA's conduct was illegal or unreasonable, which the court concluded violated neither standard.

A case not relied upon by either party or the Court of Special Appeals, however, hints that the type of discretionary authority vested in the CSEA by § 10–112 may represent a potential matter of grace, the exercise or non-exercise of discretion as to which may not be reviewable properly by the courts. In *State Department of Assessments and*

*Taxation v. Clark,* 281 Md. 385, 380 A.2d 28 (1977), this Court chose to consider whether a circuit court may exercise jurisdiction over a declaratory judgment action (which sought a declaration of unconstitutionality on equal protection and due process grounds, in the application of a statute, as well as injunctive relief) seeking review of the gratuitous reduction of a real property tax assessment by a local taxing authority. At the time of the operative facts in *Clark,* real property tax assessments were an annual ritual, with dates of finality from which a full panoply of administrative and judicial appellate rights attached for the benefit of affected property owners. Each year brought new dates of finality, triggering new appeal opportunities. The statutory scheme also provided that the local assessing authorities, by order, could decrease or abate an assessment after the date of finality in any year "in order to correct erroneous and improper assessments and to prevent injustice...." 281 Md. at 388, 380 A.2d at 31 (citing Md. Code (1957, 1975 Repl. Vol.), Art. 81, § 67). No provision for further administrative or judicial review of a decision made under Art. 81, § 67 appeared in the statute.

The Clarks' Montgomery County property was re-assessed, following rezoning in 1971, for the 1972 tax year. They did not protest or appeal the re-assessment before the 1 January 1972 date of finality. In May 1972, a sewer moratorium was declared that prevented immediate development of the Clarks' rezoned property. In August 1972, the Clarks sought a reassessment because of the moratorium. The local assessing authority, after a hearing at which the Clarks and their counsel presented evidence and argument, granted a 25% reduction in February 1973. *Id.* at 389, 380 A.2d at 31. Unsatisfied with the amount of the reduction, the Clarks appealed to the Maryland Tax Court in April 1973, but that administrative body dismissed the appeal in August 1974. Although the Clarks noted an "appeal" of that dismissal to the Court of Appeals, we ultimately dismissed the case in August 1975. *Id.*

While the Clarks' appeal to the Tax Court was pending, they concurrently initiated an original action in the Circuit Court for Montgomery County, against the local tax assessing authorities and the State Department of Assessment and Taxation, seeking a declaration that Art. 81, § 67, as applied to them, violated equal protection and due process principles to the point of being a taking, and an injunction against the levy and collection of the tax until a rehearing was held on the question of the value of their property as affected by the sewer moratorium. *Id.* at 389–90, 380 A.2d at 31–32.

Of potential relevance to the present case, the Court of Special Appeals in *Clark,* over the protests of the assessing authorities that the statutory remedies in Art. 81 for contesting property assessments were exclusive, concluded that it had inherent power to consider the Clarks' declaratory judgment action. *Id.* at 390, 380 A.2d at 32. Thus, in the posture in which the case ultimately was briefed and argued before the Court of Appeals, the question was presented squarely whether the administrative agencies' decision to grant a reduction in assessment under Art. 81, § 67, after the date of finality in the relevant tax year, was reviewable by the courts at all and, if so, under what authority and according to what standards.

The Court in *Clark* first attached significance in its analysis to several general considerations: (1) a declaratory judgment action may not be utilized in lieu of a special statutory remedy provided for in a specific type of case; (2) Art. 81 provided for a thorough scheme of administrative and judicial appeals from annual assessment decisions, keyed to the date of finality, but did not include decisions made pursuant to § 67 in that scheme; and (3) recognition of the importance to the Government in achieving a balanced budget through the ascertainment of a tax base, fixing a tax rate, and the accurate calculation and timely levy of taxes, all keyed necessarily to fixing a time for final establishment of assessments. *Id.* at 391–94, 380 A.2d at 32–34. Grounded on these premises, the analysis continued by focusing on the role Art. 81, § 67 played in the scheme. Relying on earlier cases, the Court noted that: (1) § 67 only comes into play between dates of finality; (2) no statutory authority existed conferring on a higher administrative tribunal the power to review decisions made by the local assessing authorities under § 67; (3) § 67 proceedings are not subject to judicial review under the State Administrative Procedure Act; and (4) the earlier cases characterized the authority granted under § 67 as "entirely discretionary" and as "a matter of grace." *Id.* at 394–96, 380 A.2d at 34–35. One of those cases, *LaBelle v. State Tax Commission*, 217 Md. 443, 142 A.2d 560 (1958), described the petitioning property owner's legitimate expectations under § 67 as "he can only hope that the . . . authorities . . . will agree that his cause is just and demands relief. If they do not, the statute gives him no further remedy and the assessment that has been allowed to become final remains on the books for the year in question." 217 Md. at 451–52, 142 A.2d at 565. Given the statutory scheme for administrative and judicial review of annual assessment decisions tied to the date of finality, the Court found no infirmity in concluding that the courts lacked either statutory or inherent authority to review "the potential extraordinary relief held out by § 67," existing as it did as a purely discretionary "matter of grace." *Clark*, 281 Md. at 402, 380 A.2d at 38.

There are many similarities between § 67 in Art. 81 as considered in *Clark* and § 10–112 in the Family Law Article. Both contain loose-fitting, amorphous standards for the exercise of their respective discretion ("correct erroneous and improper assessments and to prevent injustice" versus "the best interest of this State"). Neither statutory scheme of which each provision is a part authorizes expressly either further administrative review of a decision made pursuant to the statute, or judicial review. The significance of the date of finality in *Clark's* reasoning could be argued to be of like significance to that accorded the order directing the payment of child support, protected from change by § 10–112. Yet, as important to *Clark* as was the fact that Art. 81 provided a detailed and comprehensive administrative and judicial review scheme for annual final assessment, no comparable scheme exists in the Family Law Article relative to the support order upon which § 10–112 depends for efficacy. Ultimately, in the present case, we are not compelled to resolve whether *Clark's* reasoning would operate to deny Harvey a judicial answer to his claims.

cases expressly caution about the danger of exercising our inherent power of judicial review in the absence of statutory authority. *See Dep't of Natural Res. v. Linchester Sand & Gravel Corp.*, 274 Md. 211, 222–28, 334 A.2d 514, 522–26 (1975) (emphasizing that judicial review of administrative agency decisions under this inherent power "requires restrained and disciplined judicial judgment so as to not interfere with the agency's factual conclusions . . ." (citations and emphasis omitted)); *Heaps,* 185 Md. at 379, 45 A.2d at 76 (stating that "the courts are . . . without authority to interfere with any exercise of the legislative prerogative within constitutional limits, or with the lawful exercise of administrative authority or discretion"); *Hecht v. Crook,* 184 Md. 271, 280–81, 40 A.2d 673, 677 (1945) (same). Consistent with these limitations, our inherent power essentially traces its origins to our duty to ensure that neither the Legislature nor the Executive branch of State government deprives the Judiciary of the ability to correct decisions premised on unreasonable findings of fact or flawed conclusions of law. *See, e.g., Dickinson–Tidewater, Inc. v. Supervisor of Assessments,* 273 Md. 245, 256, 329 A.2d 18, 25 (1974) (applying the "substantial evidence" test to administrative decisions, which "essentially is limited 'to whether a reasoning mind reasonably could have reached the factual conclusion the agency reached' " (citations omitted)); *Heaps,* 185 Md. at 382–83, 45 A.2d at 77–78 (finding that judicial review of an administrative agency decision was proper where the agency relied on an erroneous interpretation of relevant law). In this case, Harvey invokes the inherent power of this Court by asking us to review, as a matter of law and statutory interpretation, the standards that the CSEA is obligated to apply in exercising its discretion under § 10–112.

## IV.

 Harvey characterizes the CSEA's refusal to exercise its discretion to eliminate his child support arrearages as "arbitrary, illegal, capricious or unreasonable" because the agency failed, as a matter of law, to consider the "best interests of the child" in determining whether forgiveness of Harvey's child support arrearages was within the "best interest of this State." For reasons to be explained, we conclude

that the CSEA is not bound to consider with the same primacy, if at all, the "best interests of the child," as that standard applies to most decisions relating to children, when exercising its discretion under § 10–112.

## A.

Sec. 10–106 established the CSEA in 1976 as the agency within the Department of Human Resources charged with coordinating a statewide program covering all aspects of child support enforcement. § 10–108(a); 1976 Md. Laws, Chap. 778. The duties of the CSEA include locating absent parents, determining their ability to pay child support, and enforcing those obligations (including child support judgments from other states).[20] § 10–108(a). The CSEA accomplishes enforcement through traditional mechanisms, such as legal enforcement proceedings, as well as such unconventional methods as the interception of lottery prizes and tax refunds, and inaugurating the suspension of driving privileges by the Motor Vehicle Administration. § 10–113; § 10–113.1; § 10–119.

The CSEA also is charged with the duty to "accept assignment of right, title, or interest in child support made under Article 88A, § 50(b)(2) of the Code [and to] prosecute and

---

**20.** The duties of the CSEA include:

 (1) coordinate a statewide program for support enforcement;

 (2) maintain a central registry of records on absent parents as required under § 12–105 of this article;

 (3) locate absent parents;

 (4) determine the ability of an absent parent to pay child support;

 (5) accept assignment of right, title, or interest in child support made under Article 88A, § 50(b)(2) of the Code;

 (6) in any case in which an assignment is made under Article 88A, § 50(b)(2) of the Code, prosecute and maintain any legal or equitable action available to establish each absent parent's obligation to pay child support;

 (7) cooperate with other states in establishing and enforcing child support obligations;

 (8) collect and disburse support payments through the State disbursement unit established under § 10–108.7 of this subtitle; and

 (9) use established legal processes to enforce court orders to pay support.

 § 10–108(a).

maintain any legal or equitable action available to establish each absent parent's obligation to pay child support." §§ 10–108(5)–(6). Under Md. Code (1957, 2003 Repl. Vol.), Art. 88A, § 50(b)(2), an otherwise eligible individual becomes available for temporary cash assistance benefits only if he or she "assigns to the State all right, title, and interest in support from any other person that the applicant or recipient has on behalf of any intended or potential recipient for whom the applicant or recipient is applying for or receiving assistance, including any right accrued when the assignment is executed." When individuals owing child support to the State under such an assignment accumulate unpaid arrearages, the CSEA is granted statutory authority to settle with a child support obligor for an amount less than the full arrearages.[21] Sec. 10–112, which was enacted in 1976 as part of a comprehensive statutory scheme regarding child support enforcement, 1976 Md. Laws, Chap. 778,[22] states:

---

**21.** This situation is unlike when child support obligations are owed directly from one parent to the other. In the latter circumstances, because the formulation of child support awards are governed by the "best interests of the child" standard, the parents lack the unilateral authority to enter into a settlement regarding child support arrearages because such an agreement would generally have the effect of reducing the aggregate amount of support to the child. *Duvall v. McGee*, 375 Md. 476, 492–93, 826 A.2d 416, 426 (2003) (stating that "the obligation of the father to support, imposed by law, cannot be bargained away or waived" (citations omitted)); *Lieberman v. Lieberman*, 81 Md.App. 575, 588, 568 A.2d 1157, 1163 (1990) (stating that a "parent cannot agree to preclude a child's right to support by the other parent, or the right to have that support modified in appropriate circumstances"). On the other hand, when arrearages are forgiven pursuant to § 10–112, the amount of support the child receives (or will receive) is not impacted.

**22.** When enacted initially, the language now found in § 10–112 was as follows:

If, in the judgment of the bureau [of support enforcement], compromise, settlement, or adjustment of a delinquent account or debt without suit would promote or serve the best interests of the State, the bureau may accept in full settlement of the account an amount less than full arrearages and such may be ordered by a court upon the initiation of the bureau.

1976 Md. Laws, Chap. 778. This language was codified originally as Md. Code (1957, 1979 Repl. Vol.), Art. 88A, § 59(b)(3). Upon recodification into the Family Law Article in 1984, the language of the

(a) *Authority of Administration.*—If the Administration considers it to be in the best interest of this State, in a case in which an assignment has been made under Article 88A, § 50(b)(2) of the Code, the Administration may accept in full settlement of an arrearage in child support payments an amount that is less than the total arrearage.

(b) *Authority of court.*—On request of the Administration, a court may approve by order an amount that is less than the total arrearage as full settlement of the arrearage.

Harvey argues that, notwithstanding the use of a "best interest of this State" standard in § 10–112 for settlement of arrearages, the CSEA nonetheless is bound by the traditional "best interests of the child" standard when exercising its discretion in deciding whether to forgive arrearages. Harvey guides us toward the language of § 10–118:

Subject to any federal law or program, the Administration and local support enforcement offices shall promote and serve the best interests of the child in carrying out their child support responsibilities under this subtitle.

He claims that § 10–118 represents a clear statement of legislative purpose to which the CSEA must conform when "carrying out ... child support responsibilities," which he interprets to include the settlement of arrearages pursuant to § 10–112.

### B.

Preliminarily, we must address whether the act of settling or forgiving arrearages, in the context of § 10–112, is a "child support responsibilit[y]." With regard to this point, the Court of Special Appeals held:

In further considering Harvey's argument, we are mindful that FL section 10–112 only applies when one parent has assigned his or her rights to recover child support payments from the other parent as a condition of receiving welfare

---

provision was changed to the current language. 1984 Md. Laws, Chap. 296. The revisor's note indicates that the new language was derived without substantive change from the language in Art. 88A, § 59(b)(3).

payments under Md. Code (1957, 2003 Repl. Vol.), Art. 88A § 50(b)(2). Thus, the Administration and local support enforcement offices are collecting money that will be returned to the state coffers. They are not collecting support from one parent that will go to the other parent to benefit a child. For this reason, we conclude that, in exercising its discretion under section 10–112, the Administration and local support enforcement offices are not "carrying out a child support responsibilit[y] under [the] subtitle," as described in FL section 10–118. Rather, section 10–112 simply gives the Administration the authority to settle a claim to payment that it has acquired by assignment from a parent.

*Harvey,* 158 Md.App. at 376–77, 857 A.2d at 542 (emphasis omitted).

We disagree with the intermediate appellate court on this point. Although this novel conclusion superficially appears to be supported by sound reasoning, the implications of that court's holding are inconsistent with the statutory scheme for child support enforcement. The Court of Special Appeals apparently overlooked the effect of its holding on the enforcement authority of the CSEA. If Harvey's arrearages are classified as merely a debt owed to the State, that debt would be subject only to the traditional means of enforcing judgments, rather than the more persuasive and creative enforcement mechanisms created specially for child support arrearages.[23] For example, while the ability to garnish wages as the result of an ordinary judgment is limited to 25 percent of disposable wages, a garnishment or earnings withholding or-

---

**23.** Harvey also points out that, if State-owed child support is no longer child support, but mere debt, the ability to imprison individuals for failure to pay child support would not apply to individuals whose child support has been assigned to the State. *See* Md. Const. art. 3, § 38 (providing that "[n]o person shall be imprisoned for debt," but excluding from the definition of "debt" child and spousal support arrearages); *Walter,* 367 Md. at 398, 788 A.2d at 616 (stating that "[t]his Court historically has recognized a distinction between a standard debt and a legal duty in domestic circumstances, specifically with respect to child support, and subscribes to the theory that child support is a duty not a debt").

der as the result of a child support award may be up to 65 percent of disposable wages. *See* 15 U.S.C. § 1673 (2005) (setting restrictions on ordinary garnishment of wages and garnishment as the result of a child or spousal support order); § 10–120 *et seq.;* Md. Code (1975, 2000 Repl. Vol.), § 15–601.1 of the Commercial Law Article.[24]

Removing State-owed child support collection from the scope of a "child support responsibilit[y]" would also raise serious questions about the applicability of § 12–104 to child support orders. If State-owed child support is not entitled to its special status, but is mere debt, a court no longer would be limited by § 12–104 and would be able to modify (and eliminate) retrospectively that debt, because § 12–104, by its language, only applies to child support orders and not mere debt. State-owed child support instead would be subject to the broad discretion set forth in § 5–1038(b). This, of course, is contrary to our interpretation of § 12–104 and, as Harvey argues, is unsupported by relevant case law. *See* Petitioner's Brief at 19 (stating that the "Court of Special Appeals' conclusion provides no explanation of how Maryland law provides for the mutation from child support to mere state debt, and the case-law ... supports the opposite conclusion").

## C.

Harvey argues that, because the CSEA is performing a "child support responsibilit[y]" under § 10–112, it thus is

24. The Legislature has enacted several other mechanisms designed to increase the State's ability to enforce the collection of child support awards, including the interception of tax refunds and lottery prizes and the suspension of driver's licenses and professional licenses. § 10–113 (income tax refunds); § 10–113.1 (lottery prizes); § 10–119 (suspension of driving privileges); § 10–119.3 (suspension or denial of occupational licenses). Enforcement of State-owed child support obligations under the mechanisms of these statutes, however, seemingly would not be impaired by any classification of State-owed child support arrearages as mere debt because each statute states explicitly that its enforcement mechanism applies when an individual is in arrears and the CSEA "has accepted an assignment of support under Article 88A, § 50(b)(2) of the Code ...." § 10–113(a)(1); § 10–113.1(a)(1); § 10–119(b)(1)(i); § 10–119.3(c)(1)(i)(2)(A).

bound by the "best interests of the child" standard found in § 10–118 in making decisions on the forgiveness of arrearages. We disagree. Our starting point in the analysis of this contention is the plain language of the statutes. *Johnson v. Mayor of Baltimore*, 387 Md. at 11, 874 A.2d at 445.

Sec. 10–112 clearly states that the CSEA may settle a child support arrearage if "the Administration considers it to be in the best interest of this State." There is no mention of the familiar "best interests of the child" standard. We must assume this omission was not by accident. Had the Legislature wished to mandate consideration of the "best interests of the child" as part of the CSEA's calculus in exercising its discretion to forgive arrearages, it could have done so easily. *See Mohan*, 386 Md. at 80–81, 871 A.2d at 585 (finding the absence of a limitation on the definition of "probationary status" in the Law Enforcement Officer's Bill of Rights indicative of the Legislature's desire not to limit that term in the manner suggested). When the Legislature intends that other factors be considered in addition to the best interests of the State, it explicitly and expressly has included those factors in the statutory language. *See, e.g.,* Md. Code (1982, 1996 Repl. Vol.), § 16–202(c) of the Environment Article (stating that the Board of Public Works, in determining whether to issue a license to dredge or fill State wetlands, "shall decide if issuance of the license is in the best interest of the State, taking into account the varying ecological, economic, developmental, recreational, and aesthetic values each application presents"); Md. Code (1957, 2003 Repl. Vol.), Art. 83B, § 5–611.1 (stating that when the Board of Public Works approves a division of recovered archaeological historic property that has been conveyed to a permittee, the arbiter of such a division must act "in the best interest of the State ... giving due consideration to the fair treatment of the permittee").[25] We believe that, by

---

25. Some statutes expressly included fiscal interests in contemplation of the "best interest of the State." *See, e.g.,* Md. Code (1985, 2001 Repl. Vol.), § 13–206(b) of the State Finance and Procurement Article (stating that a unit may cancel an invitation for bids or reject all bids if the unit "determines that it is fiscally advantageous or otherwise in the best

failing to include a consideration of the "best interests of the child" standard in § 10–112, the Legislature intended that the CSEA not be focused solely on such a standard in exercising its discretion to forgive State-owed child support arrearages.[26]

interests of the State"); Md. Code (1985, 2001 Repl. Vol.), § 13–217 of the State Finance and Procurement Article (stating that a unit may approve a multi-year procurement contract only if "the multi-year contract will serve the best interests of the State by encouraging effective competition or otherwise promoting economy in State procurement"). Other statutes that expand on a definition of a "best interest of the State" standard implicitly invoke principles of fiscal awareness. *See, e.g.,* Md. Code (1973, 2005 Repl. Vol.), § 4–403 of the Natural Resources Article (stating that, if the Department of Natural Resources considers it to be in the State's best interest, the Department may "exchange any area of water or land or part it owns ... for any privately owned area of water or land *equal to or greater in value* than the area of water or land the Department exchanges ..." (emphasis added)). In some instances, the "best interest of the State" standard is invoked in declaring a public policy. *See, e.g.,* Md. Code (1973, 2005 Repl. Vol.), § 5–425 of the Natural Resources Article (stating that the preservation of forests and trees by local governments is in the best interest of the State). Some statutes, however, do not elaborate on how the "best interest of the State" standard is to be applied. *See, e.g.,* Md. Code (1978, 2001 Repl. Vol.), § 13–702 of the Education Article (allowing the University System of Maryland and the Board of Regents the discretion to "establish procedures to dispose of [lost or abandoned property discovered on university property] in the best interests of the State").

26. In its opinion in the present case, the Court of Special Appeals stated that, "[i]f the legislature meant that the child's interest was the governing factor, or even a required consideration [in the CSEA's exercise of its discretion under § 10–112], it likely would have said so"—a conclusion that we echo. *Harvey,* 158 Md.App. at 375, 857 A.2d at 541. The intermediate appellate court also stated that "[w]hen the legislature intends to mandate competing factors an agency must take into account in determining the interest of the State, it knows how to do so." *Id.* at 375–76, 857 A.2d at 541. During the 2005 legislative session, the General Assembly apparently decided to demonstrate that it in fact did understand how to amend § 10–112 in that respect.

Subsequent to oral argument in this Court on 5 April 2005, Governor Robert L. Ehrlich, Jr., on 26 May 2005, signed House Bill 1181 into law. 2005 Md. Laws, Chap. 595. This legislation elaborates on the otherwise amorphous "best interest of this State" standard by adding to the current language of § 10–112 the following provisions:

(B)(1) In a case in which an assignment has been made under Article 88A, § 50(B)(2) of the Code, there is a presumption that it is in the best interest of this State for the Administration to accept in full

settlement of an arrearage in child support payments an amount that is less than the total arrearage if:

(i) The obligor, the individual who has made an assignment under Article 88A, § 50(B)(2) of the Code, and the child who is the subject of the support order have resided together for at least the 12 months immediately preceding a request for settlement under this section:

(ii) The obligor has been supporting the child for at least the 12 months immediately preceding a request for settlement under this section; and

(iii) The gross income of the obligor is less than 225 percent of the federal poverty level, as defined by the United States Department of Health and Human Services.

This new language enunciates clearly and specifically a non-exhaustive set of circumstances under which the Legislature intended forgiveness of child support arrearages to be "in the best interest of this State." Harvey is, of course, free to pursue forgiveness of his arrearages under this new statutory scheme. We note though that, although it appears that this legislation may have been enacted, at least in part, in response to the intermediate appellate court's decision in the present case, the enacted legislation, which took effect 1 October 2005, might not apply, by its plain language, to Harvey's situation as indicated in this record. In addition to assisting low income parents to reduce the financial strains of accumulated arrearages, H.B. 1181 also "rewards parents who are fulfilling their parental responsibilities by living with and providing for their children." Testimony of Delegate Samuel ("Sandy") I. Rosenberg before the Senate Judicial Proceedings Committee in Support of H.B. 1181, 29 March 2005; *see also* Letter from Brian D. Shea, Executive Director of the CSEA, to Senator Brian E. Frosh, Chairman, Senate Judicial Proceedings Committee, 28 March 2005 (stating the CSEA's support for the final version of H.B. 1181 because it is "committed to adopting State policies that help to encourage family formation"). This concept of "family formation," however, apparently applies only to those circumstances where the obligor and obligee reunite. Because the record indicates that the mother of one of Harvey's pertinent children is deceased, under the language of § 10–112 as amended there may not be a presumption that forgiveness of Harvey's arrearage, with respect to that child, would be "in the best interest of this State." Ironically, Harvey also may have precluded the application of this presumption, designed to encourage "family formation," by remarrying.

We also note, however, that the initial version of H.B. 1181, introduced by Del. Rosenberg, did not include any language limiting a presumption to those situations in which the child, the obligor parent, and the obligee parent reside together. In fact, the initial version of H.B. 1181 stated that, with limited exceptions,

... the Administration shall suspend, for a period of 3 years, the collection of an arrearage in child support payments, if the obligor provides satisfactory proof that:

(i) the obligor and the child who is the subject of the support order reside together; and

(ii) the obligor is supporting the child.

Harvey, in a purported effort to "harmonize" the two statutes, argues that the Legislature intended to supplement the "best interest of this State" standard when it enacted § 10–

This initial version provided that an obligor would be able to reapply every three years, indefinitely, for suspension of child support arrearages. The proposed legislation was amended, apparently in response to criticism of certain provisions of the bill by Legal Aid. Legal Aid, which represented Harvey during his interaction with the CSEA and BCOCSE, and later as co-counsel in both the Court of Special Appeals and this Court, stated in its testimony before the House Judiciary Committee:

> Relief from [child support arrearages owed to the State] to enable a low-income obligor to provide for his or her child is preferable to a three year moratorium on collection because it removes an economic barrier to family stability rather than simply postponing enforcement and leaving the family with the uncertainty associated with having to repay a debt that may exceed the family's resources. Therefore, Legal Aid urges the Committee to amend the legislation to establish a clear presumption in favor of abatement or set aside of state-owed arrearages for obligors who reunite with and support their children.

Testimony of the Legal Aid Bureau, Inc. regarding H.B. 1181 before the House Judiciary Committee, 23 February 2005. The House Judiciary Committee apparently responded positively to Legal Aid's advocacy by implementing the proposed amendments. In doing so, however, the Committee also added the requirement that, in order for the presumption to apply, the assignor/obligee parent must also reside with the obligor and the child(ren). This requirement reflects similar provisions in the statutes or regulations of other States allowing settlement or compromise of past arrearages. *See, e.g.,* Vt. Stat. Ann. tit. 33, § 4106(e) (2001) (stating that "[i]f [child support] arrearages accrue after support rights have been assigned [to the State] and the obligor and obligee subsequently reunite, the office of child support may not take any action to collect the support arrearages [unless the combined family income exceeds certain figures]").

The most notable and conspicuous feature of the enacted legislation, from the perspective of any potential impact on the present case, is the absence of any mention of the "best interests of the child" standard or any reference to § 10–118. Although Legal Aid, in its testimony before the Committee, maintained that § 10–112 is subject to § 10–118, it made no effort to advocate for language in § 10–112 explicitly suggesting as such. Instead, by expressly qualifying the "best interest of this State" standard in § 10–112 with a presumption that involves only a small portion of those circumstances under which forgiveness would be in the "best interests of the child," one might conclude logically that the Legislature intended that other situations where forgiveness might be in the "best interests of the child" nonetheless would be subordinate to the "best interest of this State" standard. Indeed, had the Legislature believed that § 10–118 applied to § 10–112, there would be little need for the presumption now found in § 10–112.

118. Harvey argues that the "best interests of the child" standard in § 10–118 was intended to shape and define the "best interest of this State" standard in § 10–112. We do not agree.

He reminds us that, in interpreting two provisions of a statutory scheme, we should be mindful that, when a statute "is a part of a statutory scheme, the legislative intention is not determined from that statute alone, rather it is to be discerned by considering it in light of the statutory scheme," and when "in that scheme, two statutes, enacted at different times and not referring to each other . . . address the same subject, they must be read together . . . *i.e.*, interpreted with reference to one another, . . . and harmonized. . . ." *Gov't Employees Ins. Co. v. Ins. Comm'r*, 332 Md. 124, 132, 630 A.2d 713, 717 (1993). Harvey suggests that a harmonious reading here results in the standard in § 10–112 being eclipsed, and, in essence, replaced, by § 10–118's application of the paramount standard of the "best interests of the child." We reject such an interpretation.

We conclude instead that the language of § 10–112 indicates that the Legislature intended a different standard, other than the "best interests of the child" standard, to govern the settlement of arrearages. Even though it may be a "child support responsibilit[y]," the Legislature made a conscious election that the forgiveness of arrearages was an action, separate and distinct from other "child support responsibilities," that, because of its unique purpose, warranted a different standard. Although the "best interests of the child" standard is generally the standard that applies in paternity or other family law matters relating to child support, there are some situations in which the Legislature has mandated, and the courts apply, a different standard or have limited, or in some way precluded, the application of the "best interests of the child" standard.[27] *See Langston v. Riffe*, 359 Md. 396, 425,

---

27. We note that § 5–1038(b), relied upon by Harvey as a statute mandating the application of the "best interests of the child" standard,

754 A.2d 389, 404 (2000) (finding that an "examination of section 5–1038 and its legislative history makes clear that the 'best interests of the child' standard generally has no place in a proceeding to reconsider a paternity declaration ... [nor does it have any] place in the fact-driven original paternity action"); *Reese v. Huebschman*, 50 Md.App. 709, 710–11, 440 A.2d 1109, 1111–12 (1982) (finding that, in modifying an order for child support, a court must find a "change in the parties' circumstances" before it may consider the "best interests of the child").

In this case, the Legislature's use of the "best interest of this State" standard, rather than the "best interests of the child" standard, is consistent with the notion that, because the obligation to pay child support was scrutinized at the time of imposition under the "best interests of the child" standard, any subsequent attempt to eliminate those arrearages through the exercise of an agency's discretion may be subject to a different standard that may at times be incongruent with the "best interests of the child," particularly when the State, in lieu of the delinquent, responsible parent's payment of support, has advanced public funds to support the child. Indeed, there is a remarkable distinction between the judicial determination of child support, which certainly implicates the best interests of a child, and the forgiveness of arrearages that accrued through no fault of the child and are often due to a noncustodial parent's financial problems or irresponsibility.[28]

---

in fact requires, by its plain language, consideration of more than just that standard. Sec. 5–1038(b) allows the modification or set aside of a paternity-related order "as the court considers just and proper in light of the circumstances *and* in the best interests of the child." (Emphasis added). Although we imagine that most circumstances that would be "just and proper" would also be "in the best interests of the child" (and vice versa), it would appear that the statute contemplates the possibility of some circumstances where modification or set aside may affect a child positively, but, in light of all circumstances, would not be just and proper.

28. We applaud Harvey's initiative and character in reuniting with and providing current support for his biological children and extended family; however, his brief and oral argument before us failed to

Although child support owed to the State is still child support (rather than mere debt owed to the State), we conclude that the "best interest of this State" standard also is consistent with the fact that § 10–112 covers only child support owed to the State and thus situations in which the child, through welfare assistance, has received all of the child support to which he or she was due. Furthermore, had Harvey wished to object to or contest the amount of child support he was to pay to Ms. Marshall or Ms. Williams, he could have raised that issue at the time the order was originally established or at any point along the continuum until he did act.

We also keep in mind that "a statute should be read so that no word, clause, sentence or phrase is rendered superfluous or nugatory." *Glass*, 386 Md. at 410, 872 A.2d at 734. Accepting Harvey's interpretation would do just that, render meaningless the inclusion of "best interest of this State" in § 10–112. We decline to do that. Instead, we find that § 10–118 and § 10–112 are better harmonized by giving full effect to § 10–112 as introducing a different, specific standard other than the broad direction of § 10–118.

Harvey remonstrates, however, that, by enacting § 10–118, the Legislature intended the same standard to govern "all agency child support responsibilities conducted pursuant to the entire statutory and regulatory framework governing child support, including those that were already specified in FL § 10–112." Petitioner's Brief at 27–28.[29] Be-

---

acknowledge his longstanding, pre-existing failure to fulfill his legal obligation to pay child support. Harvey is theoretically better off financially today as a result of not fulfilling his obligation to support his children prior to 1996. Yet Harvey now beseeches, in the name of his children, to erase the result of his past shortcomings.

29. Harvey uses as an example of the pervasive nature of § 10–118 the legislative history of House Bill 403 during the 2004 General Assembly session, a bill relating to the mandatory revocation of driving privileges for individuals with child support arrearages. Although H.B. 403 and its companion, Senate Bill 217, died in committee, House Bill 605, which contained the same language as H.B. 403 and S.B. 217, was signed into law by the Governor on 26 May 2004. 2004 Md. Laws, Chap.

cause § 10–118 was enacted after § 10–112, Harvey argues, "the mandate in FL § 10–118 that CSEA and local child support offices must 'promote and serve the best interests of the child in carrying out their child support responsibilities under this subtitle' clearly applies to the earlier enacted provision under the same subtitle, FL § 10–112." *Id.* at 27; 1992 Md. Laws, Chap. 561 (enactment of § 10–118). A later enacted statute, however, does not always trump an earlier-enacted statute that covers the same topic. When § 10–112 was originally enacted, it was well established that the "best interests of the child" standard governed most issues relating to children. *See, e.g., Orndoff v. Orndoff,* 252 Md. 519, 522, 250 A.2d 627, 628 (1969) (stating that the "best interest of a child is the determinative factor in custody cases"); *but see McDermott v. Dougherty,* 385 Md. 320, 374–75, 869 A.2d 751, 783 (2005) (holding that, "in private actions in which private

---

509. As first introduced, these bills sought to change the language of § 10–119 by requiring the CSEA to inform the Motor Vehicle Administration (MVA) of an obligor's arrearages to a statutory scheme allowing the CSEA the discretion to take into account certain considerations, including whether the suspension is in "the best interests of the obligor's child," when determining whether to refer an obligor to the MVA for suspension. In statements before the House Judiciary Committee, however, the executive director of the CSEA objected to the "best interests of the obligor's child" language, stating that such language was unnecessary in light of § 10–118. *See* Statement of Brian Shea, Executive Director, CSEA, before the House Judiciary Committee, H.B. 403, 19 February 2004. The language in H.B. 605 was amended in committee to reflect this recommendation by the CSEA. 2004 Md. Laws, Chap. 509. Harvey argues that this testimony, and the subsequent amendment to H.B. 605, demonstrate that "the best interests of the child doctrine is present and controlling throughout the entire child support statutory framework, even if not specifically stated in a particular provision." Petitioner's Brief at 28. Although this legislative anecdote is certainly illustrative of the scope, in isolation, of § 10–118, it sheds very little light on situations, such as the present one, where a completely different standard has been enunciated by the Legislature. When a child support statute appears without qualification, we are well instructed that § 10–118 and its "best interests of the child" language govern such a statute. When the Legislature explicitly includes a standard that may compete with or transcend the standard found in § 10–118, however, we must not surrender automatically to the language of § 10–118, but rather must examine that language as we would any other statutory pronouncement.

third parties are attempting to gain custody of children of natural parents over the objection of the natural parents, it is necessary first to prove that the parent is unfit or that there are extraordinary circumstances posing serious detriment to the child, before the court may apply a "best interest" standard"). We therefore may infer that the insertion of the "best interest of this State" standard into § 10–112 indicated that the Legislature intended the discretionary forgiveness of child support arrearages owed to the State not to be subject to the usual primacy of the "best interests of the child" standard.[30] The legislative history of § 10–118 reveals that § 10–118 was intended to "*merely* codif[y] what should be the current practice of the Child Support Enforcement Administration and local support enforcement offices." *See* Senate Judicial Proceedings Committee, Bill Analysis 1992, H.B. 769 (codified ultimately as § 10–118) (emphasis added). When a statute "merely codifies" an already applicable standard, we afford it less weight in determining whether that statute trumps a previously enacted statute that diverges from the existing standard.[31]

---

**30.** This is not to say that the CSEA may not factor into its calculus the "best interests of the child" when exercising its discretion whether to forgive child support arrearages. We hold, rather, that that standard is neither the sole or paramount one controlling such decisions.

**31.** Harvey also argues that the CSEA's apparent failure to consider the "best interests of the child" was "arbitrary, illegal, capricious or unreasonable" because it was contrary to and inconsistent with the CSEA's stated "guiding principle," included in its mission statement, to keep the "best interest of the child [as] our highest priority." Although we recognize an agency decision may be deemed "arbitrary or capricious" if it ignores the expressly stated policy goals of the agency, *see* Arnold Rochvarg, *Maryland Administrative Law* § 4.38 at 129 (2001, 2004 Supp.), we find that the CSEA was not obligated to apply, as a result of this arguably aspirational policy goal, the "best interest of the child" standard in declining to forgive Harvey's child support arrearages. In situations in which courts have determined that stated policy goals may influence a finding of "arbitrary, illegal, capricious or unreasonable" action, the stated policy goal has referred explicitly and specifically to the particular action or exercise of discretion being challenged. *See, e.g., Hurl,* 107 Md.App. at 306–09, 667 A.2d at 980–82 (finding that a transfer must be within "sound educational policy"). When an administrative agency adopts, on its own, a broad or aspira-

## V.

## A.

 Harvey continues that, even if the CSEA was not required to apply the "best interests of the child" standard, Maryland courts have the inherent power to review the discretionary decision of the CSEA not to forgive Harvey's arrearages. *See Gould,* 273 Md. at 510–11, 331 A.2d at 70 (affirming the inherent power of Maryland courts to review the discretionary actions of administrative agencies); *see also Gonzales v. Ghingher,* 218 Md. 132, 136–37, 145 A.2d 769, 772 (1958) (finding the reasoning of the Mayor and Treasurer of Baltimore City regarding the exercise of purely discretionary power to grant or deny an amusement license "arbitrary and unreasonable in a legal sense"). When an agency engages in proper fact-finding and applies the appropriate law, our inquiry is limited solely to whether, given the relevant standard and facts, the administrative agency's decision was "arbitrary, illegal, capricious or unreasonable." *Gould,* 273 Md. at 500–01, 331 A.2d at 65. In order to determine properly whether the CSEA's refusal to exercise its discretion under § 10–112 was "arbitrary, illegal, capricious or unreasonable," we must first determine the boundaries of such a standard.

 When an administrative action is subject to the Administrative Procedure Act ("APA"), the APA grants a reviewing court the power to "reverse or modify the decision

---

tional policy goal outside the formal rule-making process and does not specifically address a particular agency action, the impact of such a policy statement on our analysis of the present matter is questionable at best.

Likewise, Harvey included in his Reply Brief in this Court statements by the CSEA's Executive Director regarding an arrearage forgiveness program under development that, as Harvey argues, "clearly indicates an explicit policy understanding by CSEA that the interests of the State are aligned with the best interests of the children." Petitioner's Reply Brief at 16. Although the "best interest of this State" may at times converge with the "best interests of the child," Harvey presents no evidence that the proposed arrearage forgiveness program ever was implemented or that the CSEA deviated from a current adopted policy in his case.

[of an administrative agency] if any substantial right of the petitioner may have been prejudiced because a finding, conclusion, or decision ... is arbitrary or capricious." Md. Code (1984, 2004 Repl. Vol.), § 10–222(h)(3)(vi) of the State Government Article. Although we are cognizant that the particular situation presented in this case under § 10–112 was not a "contested case" at the time it was considered by the agency and therefore the APA does not apply, Maryland cases suggest that "an administrative proceeding, even if not subject to judicial review under the APA, would be subject to judicial review, of essentially the same scope, in an action for mandamus, certiorari, injunction or declaratory judgment [under the framework of *Heaps, Gould,* and their progeny]." *Med. Waste Assocs. v. Maryland Waste Coalition,* 327 Md. 596, 610, 612 A.2d 241, 248 (1992); *see also Dickinson–Tidewater,* 273 Md. at 255–56, 329 A.2d at 25 (finding that the substantial evidence test, which the courts use when acting pursuant to the inherent ability to review administrative decisions, "is similar to the tests laid down by [the APA]"); *Hurl,* 107 Md.App. at 305, 667 A.2d at 979 (finding that "the standards of judicial review of agency decisions are essentially the same whether proceeding under the APA or pursuant to our inherent power to review administrative actions"). Because the standard of review under our inherent power of judicial review of discretionary administrative action is similar, if not identical, to the "arbitrary or capricious" standard enunciated in the APA, we therefore conclude that "it is appropriate for this Court to examine and rely upon cases decided under the APA for guidance regarding the appropriate standard of review of [an agency's] decision." *Hurl,* 107 Md.App. at 305, 667 A.2d at 979.

In *Spencer v. Board of Pharmacy,* 380 Md. 515, 529–30, 846 A.2d 341, 349 (2004), we examined the analogous standard to be applied in the context of review under the APA,

> ... when an agency acts neither as a finder of fact nor as an interpreter of law but rather in a "discretionary" capacity.... Logically, the courts owe a higher level of deference to functions specifically committed to the agency's discretion

than they do to an agency's legal conclusions or factual findings. Therefore, the discretionary functions of the agency must be reviewed under a standard more deferential than either the *de novo* review afforded an agency's legal conclusions or the substantial evidence review afforded an agency's factual findings. In this regard, the standard set forth in § 10–222(h)(3)(vi) [of the APA], review of "arbitrary or capricious" agency actions, provides guidance for the courts as they seek to apply the correct standard of review to discretionary functions of the agency.

(citations omitted).

A review of Maryland case law demonstrates that this "arbitrary or capricious" standard is, perhaps intentionally, less than well-defined with respect to judicial review of discretionary actions.[32] In his *Maryland Administrative Law* treatise, Professor Arnold Rochvarg examines, in the context of the APA, the "arbitrary or capricious" standard, concluding that it

... is best understood as a reasonableness standard. If the agency has acted unreasonably or without a rational basis, it has acted in an arbitrary or capricious manner.... [Unlike a court's "substantial evidence" review of an agency's factual determinations, u]nder arbitrary or capricious review, the court's reasonableness review goes beyond factual findings and goes beyond a review of the agency record. Under arbitrary or capricious reasonableness review, the court will consider any argument that the agency acted unreasonably regardless of whether it appears within the agency record.

\* \* \*

It is impossible to catalogue every circumstance when an agency acts in an arbitrary or capricious manner. Attorneys and judges should merely understand that the standard requires rational conduct by the agency in all respects. Each case must be evaluated on an individual basis.

---

**32.** The irony hidden in the potential of the "arbitrary or capricious" standard to be itself at times vague or nebulous in explanation and/or application does not escape us.

Arnold Rochvarg, *Maryland Administrative Law*, § 4.38 at 128 (2001, 2004 Supp.).

We also find, as Professor Rochvarg observes, *id.*, some guidance in the definitions found in Black's Law Dictionary. Black's defines "arbitrary" as including those judicial decisions "founded on prejudice or preference rather than on reason or fact." Black's Law Dictionary 112 (8th ed. 2004). Black's defines "capricious" as including those decisions "characterized by or guided by unpredictable or impulsive behavior, ... contrary to the evidence or established rules of law." [33] *Id.* at 224. Merriam–Webster's Collegiate Dictionary, as another example, defines "arbitrary" as

> 1: depending on individual discretion (as of a judge) and not fixed by law ... 2 a: not restrained or limited in the exercise of power: ruling by absolute authority ... b: marked by or resulting from the unrestrained and often

---

**33.** We note that earlier editions of Black's, including those cited in *Maryland Administrative Law* and several Maryland cases, contain remarkably different definitions of both "arbitrary" and "capricious," and contain a separate definition of "arbitrary and capricious" that apparently was removed beginning with the seventh edition. The sixth edition of Black's defines "arbitrary" as:

> In an unreasonable manner, as fixed or done capriciously or at pleasure. Without adequate determining principle; not founded in the nature of things; nonrational; not done or acting according to reason or judgment; depending on the will alone; absolutely in power; capriciously; tyrannical; despotic; ... Without fair, solid, and substantial cause; that is, without cause based upon the law, ... not governed by any fixed rules or standard. Willful and unreasoning action, without consideration and regard for facts and circumstances presented....

Black's Law Dictionary 104–05 (6th ed. 1990). "Capricious disregard" was defined as "[a] wilful and deliberate disregard of competent testimony and relevant evidence which one of ordinary intelligence could not possibly have avoided in reaching the result." *Id.* at 211. This earlier edition of Black's defines "arbitrary and capricious" as "[c]haracterization of a decision or action taken by an administrative agency or inferior court meaning willful and unreasonable action without consideration or in disregard of facts or law or without determining principle." *Id.* at 105. As with the definitions of "modification" and "set aside" referenced earlier in this opinion, Black's gives no indication for why these definitions were altered, or, in this instance, completely removed.

tyrannical exercise of power ... 3 a: based on or determined by individual preference or convenience rather than by necessity or the intrinsic nature of something ... b: existing or coming about seemingly at random or by chance or as a capricious and unreasonable act of will. . . .

Merriam–Webster's Collegiate Dictionary 59 (10th ed. 1999).

Webster's defines "capricious" as "governed or characterized by caprice," which in turn is defined as "1 a: a sudden, impulsive, and seemingly unmotivated notion or action b: a sudden usu[ally] unpredictable condition, change, or series of changes ... 2: a disposition to do things impulsively. . . ." *Id.* at 169.

These definitions echo Professor Rochvarg's explication that, so long as the actions of administrative agencies are reasonable or rationally motivated, those decisions should not be struck down as "arbitrary or capricious." "Arbitrary or capricious" decision-making, rather, occurs when decisions are made impulsively, at random, or according to individual preference rather than motivated by a relevant or applicable set of norms. Indeed, this conclusion is confirmed by the Maryland courts' application of the "arbitrary or capricious" standard to several differing circumstances involving allegations that an administrative agency's decision was "arbitrary or capricious."

Few Maryland cases have developed a detailed general definition of "arbitrary or capricious," relying instead on a case-by-case development or an application of the standard solely to the case at hand. *See* Rochvarg, *supra*, at § 4.38 at 128 (finding that, because of the relative ambiguity of the "arbitrary or capricious" standard, "[e]ach case must be evaluated on an individual basis"); *Maryland State Bd. of Social Work Exam'rs v. Chertkov*, 121 Md.App. 574, 585–86, 710 A.2d 391, 396 (1998).

Most cases, however, recognize as a threshold matter the extremely deferential nature of the "arbitrary or capricious" standard. In reviewing a claim that an administrative sanction was so disproportionate to the misconduct involved as to

be "arbitrary or capricious," the Court in *Maryland Transportation Authority v. King* stated:

> As long as an administrative sanction or decision does not exceed the agency's authority, is not unlawful, and is supported by competent, material and substantial evidence, there can be no judicial reversal or modification of the decision based on disproportionality or abuse of discretion unless, under the facts of a particular case, the disproportionality or abuse of discretion *was so extreme and egregious that the reviewing court can properly deem the decision to be "arbitrary or capricious."*

369 Md. 274, 291, 799 A.2d 1246, 1255–56 (2002) (emphasis added). Other cases have adopted this "extreme and egregious" synonym for "arbitrary or capricious." *See, e.g., Bd. of Physician Quality Assurance v. Mullan*, 381 Md. 157, 170–71, 848 A.2d 642, 650 (2004) (referencing the "extreme and egregious" standard in finding that, as a matter of law, "a delay in the issuance of [an administrative agency's order] is a relevant factor in determining whether the agency properly exercised its statutory discretion, judicially reviewed under the extremely deferential arbitrary or capricious standard"); *but see* Rochvarg, *supra*, at 24 (2004 Supp.) (commenting that an "extreme and egregious" definition of "arbitrary or capricious" is "much too deferential" and that "[c]ourts would be abdicating their responsibility if they were only willing to reverse an agency under the arbitrary or capricious standard for extreme and egregious conduct"). In *Maryland Aviation Admin. v. Noland*, 386 Md. 556, 581, 873 A.2d 1145, 1160 (2005), we expanded upon the standard announced in *King*:

> In sum, when the discretionary sanction imposed upon an employee by an adjudicatory administrative agency is lawful and authorized, the agency need not justify its exercise of discretion by findings of fact or reasons articulating why the agency decided upon the particular discipline. A reviewing court is not authorized to overturn a lawful and authorized sanction unless the "disproportionality [of the sanction] or abuse of discretion was so extreme and egregious that the reviewing court can properly deem the decision to be 'arbi-

trary or capricious.'" Furthermore, the employing agency does not have the burden, in the reviewing court, of justifying such a sanction. Instead, in accordance with the principle that the agency's decision is prima facie correct and presumed valid, . . . the burden in a judicial review action is upon the party challenging the sanction to persuade the reviewing court that the agency abused [its] discretion and that the decision was "so extreme and egregious" that it constituted "arbitrary or capricious" agency action.

(citations omitted).

Some cases suggest that the meaning of "arbitrary or capricious" varies according to the level of discretion afforded to a particular agency. *See Spencer,* 380 Md. at 531, 846 A.2d. at 350 (finding that "[w]hether an action is in fact deemed arbitrary or capricious will vary depending upon the amount of discretion granted an agency, a matter of substantive law"). In *Spencer,* the Court considered whether the refusal of the Maryland State Board of Pharmacy to refer for hearing a pharmacist's disciplinary matter to the Maryland Office of Administrative Hearings (OAH) was "arbitrary or capricious." 380 Md. at 527–30, 846 A.2d at 348–50. The Board had issued charges against Spencer for practicing pharmacy without a license after the Board failed to receive a timely license renewal application from Spencer (although Spencer claimed that she in fact mailed the application). *Id.* at 518–20, 846 A.2d at 343–44. Based on her belief that members of a Board panel that was scheduled to hear the charges against her were biased against her, Spencer sought to have the matter referred to the OAH, a decision committed exclusively to the Board's discretion. *Id.* at 521–22, 846 A.2d at 344–45. The Board refused to refer the matter, and Spencer sought judicial review. *Id.,* 846 A.2d at 345.

The Court of Special Appeals agreed with Spencer that the presence of certain Board members on the panel prejudiced her rights, and remanded the case with directions that the matter be referred to the OAH. *Id.* at 522, 846 A.2d at 345. We reversed, however, concluding that, even though Spencer's rights in fact were prejudiced by the presence of those mem-

bers, the Court of Special Appeals exceeded its authority in directing the matter be referred to the OAH. *Id.* at 531–32, 846 A.2d at 350–51. We directed remand of the matter to the Board with instructions to it to cure, through any manner available to the Board, the prejudice caused by the presence of the biased Board members on the panel. *Id.* at 534, 846 A.2d at 352. In finding it "clear that the Board's decision to forgo the OAH was not arbitrary or capricious," the Court stated:

> An agency's prerogative with respect to case referral to the OAH is similar in scope to that of the agency's prerogative in determining the severity of sanctions [citing *King* ], or to that of forgoing prosecution of a particular individual. In such cases, it is most difficult to apply or even articulate a judicial standard by which the agency's discretionary decision might be deemed arbitrary or capricious, *cf. Heckler v. Chaney,* 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) (holding that the FDA's decision not to take enforcement actions was not subject to judicial review under the federal APA because such enforcement decisions are "committed to agency discretion by law" and do not supply the courts with "law to apply," that is, a legal standard to which the agency can be held). The reviewing court, absent some showing of fraud or egregious behavior on behalf of the agency, will be hard pressed to articulate a reason why the agency acted arbitrarily or capriciously when it did not send the case to the OAH. This is true for the case before us today. Even conceding the error of the Board's failure to recuse certain members from the panel, that alone does not suffice to render arbitrary or capricious the Board's decision not to refer to the OAH.

*Id.* at 533, 846 A.2d at 351–52 (some citations omitted).

 Although some cases, such as *Spencer,* perceive that agency discretion, by its nature, may be well-insulated from judicial review, other cases have applied more particularized scrutiny to determine whether an agency action was "arbitrary or capricious." An agency decision, for example, may be deemed "arbitrary or capricious" if it is contrary to or inconsistent with an enabling statute's language or policy goals.

*See, e.g., Hurl,* 107 Md.App. at 306, 667 A.2d at 980 (finding an elementary school teacher's transfer not "arbitrary or capricious" in light of standards found in the enabling statute and relevant regulations); Rochvarg, *supra,* at § 4.38 at 129 (stating that "[a]n agency decision that is contrary to the enabling statute's language or policy goals is a decision that is arbitrary or capricious").

 Even if an administrative agency does not articulate policy goals within its pertinent regulations or such are not expressed in the agency's enabling statute, an agency action nonetheless may be "arbitrary or capricious" if it is irrationally inconsistent with previous agency decisions. *See Christopher v. Montgomery County Dep't of Health & Human Servs.,* 381 Md. 188, 215, 849 A.2d 46, 61–62 (2004) (rejecting a food stamp recipient's claim that an agency's denial of a benefit was "arbitrary or capricious" based on her contention that she was being singled out because there was "no evidence in the record that the [administrative law judge] treated [the recipient] any differently from any other applicant claiming to be disabled, acted inconsistently, or deviated from prior policies relating to disability determinations under the Food Stamp Program"). In *Montgomery County v. Anastasi,* 77 Md.App. 126, 549 A.2d 753 (1988), the Court of Special Appeals affirmed a circuit court's reversal of decisions of the Montgomery County Merit System Protection Board with respect to promotion of police officers. The court found that, although an administrative agency certainly has some leeway to abandon prior decisions and "adapt [its] rules and policies to the demands of changing circumstances," an agency's decisions must also "not be so fluid as to become arbitrary or capricious." *Id.* at 137, 549 A.2d at 758 (citations omitted). In *Anastasi,* the court found the Board's actions to be "arbitrary or capricious" because the Board acted in a manner inconsistent with policies adopted in prior cases regarding the consultation of persons not on the Board, without providing an adequate explanation for the divergence. *Id.* at 137–39, 549 A.2d at 758–59. Just as actions that are inconsistent with prior administrative precedents may be deemed "arbitrary or

capricious," an agency action also may be deemed "arbitrary or capricious" if similarly situated individuals are treated differently without a rational basis for such a deviation. *See Chertkov*, 121 Md.App. at 589, 710 A.2d at 398 (finding that, even if an agency decision is supported by substantial evidence, it may nonetheless be "arbitrary or capricious" if individuals are given substantially different sanctions for identical conduct).

## B.

The substance of Harvey's concluding argument is that the CSEA's refusal to exercise its discretion to forgive his arrearages was "arbitrary or capricious" because it was the result of the illegal delegation of authority and discretion to a private corporation (BCOCSE/MAXIMUS) whose conduct was tainted with private self-interest. For reasons to be explained, we conclude that the CSEA's decision not to exercise its discretion to grant relief to Harvey under § 10–112 was not the result of an illegal or unreasonable (and thus "arbitrary or capricious") delegation of authority, nor was it the product of "arbitrary or capricious" reasoning or rationales.

## 1.

At the threshold of this argument, Harvey betrays a misunderstanding of the fundamental relationship between the CSEA and BCOCSE. As stated *supra* Section IV.A., the CSEA was created in 1976 as an agency within the Department of Human Resources ("Department") for the purpose of coordinating a statewide program covering all aspects of child support enforcement. § 10–106; § 10–108; 1976 Md. Laws, Chap. 778. In 1995, the Legislature established the Child Support Enforcement Privatization Pilot Program, which operates in Baltimore City and Queen Anne's County. 1995 Md. Laws, Chap. 491. Sec. 10–119.1(c) lays out the purpose and scope of this privatization program:

> The purpose of the Pilot Program is to authorize the Secretary of the Department to enter into contracts with

private companies to privatize all aspects of child support enforcement functions of the Department, including . . . establishing support orders; . . . collecting and disbursing support payments; . . . reviewing and modifying child support orders; and . . . enforcing support obligations.

At all times relevant to these proceedings, BCOCSE/MAXIMUS was a private agency that had contracted with the CSEA to carry out, in selected jurisdictions, its child support enforcement functions, including those outlined in § 10–119.1(c). Harvey argues that it was "arbitrary or capricious" for the CSEA to "abdicate[ ] its authority entirely to the private delegate [BCOCSE] without exercising any meaningful review of the decision." Petitioner's Brief at 33–34.[34] The record, however, reveals no such complete handover to BCOCSE on the part of the CSEA.

The memorandum from Ms. Kaiser to the project director of BCOCSE proposing certain actions with respect to Harvey's arrearages was simply that—a proposal. There is nothing in the record to suggest that Ms. Kaiser or anyone else at the CSEA demanded, ordered, or mandated that the specified actions be taken with regard to Harvey's account. Accepting the memorandum as a proposal inviting feedback, rather than as an order from a superior, BCOCSE thereafter provided the CSEA with its recommendations and objections, including its concerns over the "collection rate" and the ability to accommodate administratively the proposed actions. It is not "arbitrary or capricious" for an agency to solicit feedback, recommendations, or objections from its private delegate (especially with respect to decisions that may affect directly the private

---

**34.** Harvey characterizes his attempts to achieve forgiveness of his child support arrearages as follows:

> Mr. Harvey again requested CSEA to exercise its discretion under FL § 10–112 to abate the remaining state-owed arrearages, which the agency's Executive Director promised to do in her July 6, 2001 letter. . . . The Executive Director then told MAXIMUS/BCOCSE to essentially suspend collection, but then acquiesced to MAXIMUS/BCOCSE's refusal.

Petitioner's Reply Brief at 5.

delegate), so long as the agency retains the ultimate control over the exercise of its statutorily granted discretion. Although the CSEA certainly appears to have acquiesced in the recommendations and objections of BCOCSE, the ultimate discretion was exercised (or, in this case, not exercised in Harvey's favor) by the CSEA. Despite Harvey's arguments to the contrary, a total and complete abdication of discretion did not occur in this case.[35]

<div align="center">2.</div>

Harvey argues that, even if the CSEA's acquiescence was not per se "arbitrary or capricious," it was unreasonable, and therefore "arbitrary or capricious," for the CSEA to acquiesce in the particular reasons that BCOCSE gave for objecting to the proposed forgiveness plan. In her testimony at the Circuit Court, an official from BCOCSE acknowledged that "one of the reasons" BCOCSE objected to the proposed

---

**35.** Although Harvey explicitly states that he is not "attacking" the statutory child support privatization scheme, the amicus brief submitted in support of Harvey is not so reserved. The Public Justice Center ("PJC") presents a critique of privatization of governmental services, both locally and nationally. What the PJC fails to realize is that this case is not about the merits of privatization. This case is about whether a decision made by an administrative agency to refuse to exercise its statutory discretion to forgive child support arrearages, based on the recommendation of a private delegate, may be characterized as "arbitrary or capricious." There is nothing "arbitrary or capricious," however, about a decision, based on sound reasoning, that, for whatever reason, is not as effective as originally thought. Neither this Court, nor any court, is vested with authority to second guess the Legislature on such a record as the one in this case. If the PJC, or any interested citizen, believes that privatization is not a wise policy choice, he, she, or it may exercise the right to petition the Legislature to change the statutory law. It is not our choice to make.

Nor is this the correct forum in which to air effectively grievances and complaints about MAXIMUS, the private organization operating BCOCSE at the time of the operative facts of this case. *See* Amicus Brief at 11 (highlighting a study that characterized management of BCOCSE during the tenure of MAXIMUS as "not encouraging"); *id.* at 19 (accusing MAXIMUS of mishandling child support cases in Colorado); *id.* at 20–21 (citing concerns by the CSEA in 2002 that MAXIMUS was mishandling child support cases in Maryland as illustrative generally of "the risk of serious harm to individuals served by government programs under privatization").

forgiveness plan was "that it would potentially harm the numbers that show the local enforcement office's collection rate." Harvey argues that it was "arbitrary or capricious" for the CSEA to ratify BCOCSE's pecuniary self-interest by acquiescing in its objection to the proposed forgiveness plan based on financial considerations.

In order to determine whether it was "arbitrary or capricious" for the CSEA to consider the financial implications or impact on BCOCSE's "collection rate" in its decision not to exercise its discretion to grant relief to Harvey under § 10–112, we must examine such a decision in light of the standard announced by the Legislature in enacting § 10–112. The question becomes whether the CSEA's consideration of the fiscal impact of the requested action was a reasonable action taken for the "best interest of this State."

We begin by examining the State's purpose, divined through the legislative history, in enacting a privatization scheme for the enforcement of child support obligations in certain jurisdictions. The privatization program in § 10–119.1 was enacted in 1995 as part of Senate Bill 754, which included larger welfare reform legislation creating a Welfare Reform Pilot Program in selected geographic portions of the State, including Baltimore City.[36] 1995 Md. Laws, Chap. 491. In addition to providing incentives for individuals to reduce welfare dependency and increase self-sufficiency, such as time limits on the receipt of AFDC benefits and mandatory work requirements, the legislation also created penalties, such as the suspension of driving privileges (codified at § 10–119), for

---

**36.** When enacted initially in 1995, the General Assembly provided that the Child Support Enforcement Privatization Pilot Program would remain in effect for four years, subject to abrogation at the end of 30 June 1999. 1995 Md. Laws, Chap. 491. In 1999, the child support privatization program was extended until 31 October 2002, with language in the 2003 State Budget allowing the privatization program to continue until 30 June 2003. 1999 Md. Laws, Chap. 486. In 2003, the General Assembly extended the effective period of the privatization program for a period of 6 years and 4 months, to be abrogated and of no further force and effect on 30 September 2009. 2003 Md. Laws, Chaps. 312, 392.

individuals who fall behind in their child support obligations. 1995 Md. Laws, Chap. 491; *see also Maryland Classified Employees Ass'n v. State*, 346 Md. 1, 5–7, 694 A.2d 937, 938–40 (1997) (describing the features and welfare reform provisions of S.B. 754). These new incentives and enforcement techniques were expected to result in significant financial savings with respect to AFDC expenditures.[37] *See* 1995 Md. Laws, Chap. 491, preamble of S.B. 754 (stating that the "General Assembly has established welfare reform ... with the intended goal of achieving a significant reduction in the number of citizens who are enrolled in the [AFDC] program").

The welfare privatization provisions, however, did not begin as part of S.B. 754. While S.B. 754, without the privatization provisions, was being considered in the Senate, the House of Delegates was considering House Bill 1177. H.B. 1177, introduced on 20 February 1995, would have "establishe[d] a Child Support Enforcement Privatization Pilot Program in the Department of Human Resources ... to privatize all child support enforcement functions in Baltimore City and [Queen Anne's County] by July 1, 1996." Department of Fiscal Services, Fiscal Note Revised 1995, H.B. 1177. Although H.B. 1177 was not passed by both houses of the Legislature, its provisions regarding child support privatization were incorporated into S.B. 754, which was signed into law on 25 May 1995.[38] 1995 Md. Laws, Chap. 491. The legislative history of

---

37. In 1996, the General Assembly abolished the "Welfare Reform Pilot Program" in the selected jurisdictions in favor of an alternative approach, but did not disturb the child support privatization program enacted by 1995 Md. Laws, Chap. 491, nor did it affect such state-wide measures such as the suspension of driving privileges for obligors in arrears. 1996 Md. Laws, Chap. 351.

38. H.B. 1177, as amended, received a favorable report from the Appropriations Committee and later passed the House of Delegates on 23 March 1995. The legislation then was referred to the Senate Judicial Proceedings Committee, where it was amended and reported favorably. On 6 April 1995, the full Senate rejected the legislation by a vote of 23–24, and H.B. 1177 died. At this point, S.B. 754 had passed the Senate without any privatization provisions and was awaiting action in the House Appropriations Committee. On 8 April 1995, however, the provisions of H.B. 1177 were added to S.B. 754 in the House Commit-

H.B. 1177 reveals that the Legislature harbored deep concerns over the then-current state of child support enforcement, and viewed privatization as a viable solution. For example, the Floor Report of the House Committee on Appropriations, to which H.B. 1177 was referred, describes the Committee's rationale for supporting the privatization measures in H.B. 1177:

> ... In FY 1994, DHR collected $50.6 million in child support in Baltimore City, or 11% of the total child support obligations in the City. Approximately $420 million in support orders went uncollected. DHR spends $11.1 million annually for child support enforcement annually in the City. This works out to be $4.50 in collections for every $1 spent on enforcement.

> This rate of collection is absolutely intolerable. With the majority of cases in the City also on AFDC, uncollected support orders result in additional AFDC costs for the State. A large part of the failure of child support collection is inherent in the inefficiencies of government. By contracting this service out, enforcement functions can be run in a more efficient manner. A private contractor will have more flexibility to base pay on performance and to update computer technology more rapidly.

These financial considerations are explicitly set forth in § 10–119.1. Section 10–119.1(d) mandates that the Secretary of the Department shall "adopt regulations that ... (ii) provide for the reimbursement of any private contractor; [and] (iii) prohibit the cost of transferring child support enforcement to private contractors as defined in item (ii) of this paragraph from exceeding the fiscal year 1995 administrative cost per

tee and reported favorably to the full chamber. Two days later, on the last day of the legislative session, the full House passed the legislation, by a vote of 120–19, and the bill was returned to the Senate for concurrence. The Senate concurred in the House amendments, by a vote of 46–1 occurring at 10:50 p.m. (a full 70 minutes before *sine die*), and S.B. 754 was signed into law by the Governor on 25 May 1995. *See Maryland Classified Employees Ass'n,* 346 Md. at 5–12, 694 A.2d at 938–42 (describing the legislative history of H.B. 1177 and S.B. 754).

child support dollar collected by the Child Support Enforcement Administration in the Pilot Program areas...." This language indicates clearly the primary concern of privatization: to save the State money by ensuring that funds paid to a private contractor are lower than the administrative cost of enforcing child support obligations through means in place prior to the initiation of the privatization program.

The financial interests of the State are also implicated by the level of performance of its child support enforcement offices, be it private or public. Under 42 U.S.C. § 658a (2005), the federal government pays incentives to States based on their performance with regard to the establishment and enforcement of child support orders and the collection of past-due child support arrearages. These incentives are deposited by the State into the Child Support Reinvestment Fund, which "is a special, nonlapsing fund that shall consist of all of the federal performance incentive payments received by the Department of Human Resources in a fiscal year." §§ 10–106.1(b), (c)(1). Although the regulations promulgated pursuant to § 10–106.1 provide that "the incentive amount that would be paid to a privatized support enforcement agency in a subdivision shall be retained by [the CSEA]," COMAR 07.07.11.03, this does not diminish the consequence that a heightened collection rate affects positively the financial interests of the State by increasing the level of federal incentive payments.

This concern with fiscal efficiency appears to be an integral part of Maryland's child support enforcement scheme, reflected not only in § 10–119.1, but in other statutes and case law. For example, in 1978 the responsibility for child support enforcement was transferred from the Department of Parole and Probation to the Department of Human Resources. 1978 Md. Laws, Chap. 885. The legislative history reveals that this change was made in the interest of fiscal efficiency and a more streamlined collection process. *See* Report to the House Appropriations Committee of the Maryland General Assembly on Domestic Collections in Maryland, Department of Human Resources, 20 December 1977 (stating the Department's sup-

port for the proposed legislation because it "best serves all the citizens of the State by having the potential for increasing the amount of support actually collected, reducing welfare costs, and reducing the costs of administering the system"); Statement of Roger P. Winter, Assistant Secretary of Human Resources, H.B. 607, 19 January 1978 (stating that the Department "has the incentive to manage the Domestic Collections program well. Collection efforts on behalf of welfare clients can substantially cut the payout of welfare funds").[39]

Even the paternity statutes, codified at § 5–1001 *et seq.*, state as their express purpose not only the promotion of "the general welfare and best interests of children born out of wedlock," but also the "impos[ition] on the mothers and fathers of children born out of wedlock the basic obligations and responsibilities of parenthood." § 5–1002(b); *see Common-*

---

**39.** This same fiscal rationale also is found in the legislative histories of the enactment of several child support enforcement mechanisms, including the interception of lottery prizes, *see* Department of Fiscal Services, Fiscal Note Revised 1988, S.B. 441 (ultimately codified at § 10–113.1) (stating that the proposed legislation would result in general funds revenues increasing due to increased AFDC collections and federal incentives), earnings withholding orders, *see* Department of Fiscal Services, Fiscal Note Revised 1985, H.B. 618 (ultimately codified at § 10–120 *et seq.*) (finding that the proposed legislation would result in the receipt of "an estimated $462,292 in AFDC offset funds ... in FY 86"), and the suspension of driving privileges. *See* Department of Fiscal Services, Fiscal Note Revised 1995, S.B. 754 (ultimately codified at § 10–119) (estimating that $13.6 million in AFDC-related delinquent child support payments could be collected through the suspension of driver's licenses in the first year alone, with "[f]uture year state AFDC related child support collections ... increas[ing] by $3.4 million annually thereafter"). Furthermore, this fiscal purpose also was present in legislation authorizing the interception of income tax refunds, initially only in those situations in which the obligee parent had assigned his or her child support rights to the State as a condition of receiving welfare assistance. *See* Letter from Bill B. Benton, Deputy Secretary, Department of Human Resources to Hon. Tyras S. Athey, Chairman, House Committee on Ways and Means, 4 April 1980 (noting that collecting from an obligor in cases where support is owed to the State has no effect on whether needy children receive assistance, and instead "provides an equitable way of reducing the costs of welfare ..."); Department of Fiscal Services, Fiscal Note 1980, S.B. 641 (ultimately codified as § 10–113) (estimating that the proposed legislation will result in two million dollars of revenue that would be used to offset welfare costs).

*wealth of Virginia ex rel. Halsey v. Autry,* 293 Md. 53, 61, 441 A.2d 1056, 1060 (1982) (finding that one of the main purposes of the paternity statutes "is to shift the burden of support from the taxpayers to the parents of the illegitimate child"); *Mayor of Rockville v. Randolph,* 267 Md. 56, 61, 296 A.2d 574, 576 (1972) (finding that the "main purpose [of the paternity statutes] is the shifting of some of the burden of financial support of illegitimates from the taxpayer to the father" (citations omitted)). Because the CSEA is not obligated, under § 10–112, to apply transcendently the "best interests of the child" standard, if at all, we conclude that it is reasonable, in light of the foregoing financial considerations, to premise the refusal to exercise discretion under § 10–112 to grant an obligor's request for relief on concerns over the potential fiscal impact to the State.

Harvey maintains that the CSEA's acquiescence in BCOCSE's objections to the proposed forgiveness plan based on an impact on its "collection rate" represented an illegitimate,[40] and thus "arbitrary or capricious," motivation for

---

**40.** As an example of a "wholly illegitimate" pecuniary self-interest of a private company, Harvey cites *Rozmus v. Rozmus,* 257 Neb. 142, 595 N.W.2d 893 (1999). In *Rozmus,* the State contracted with a private, for-profit company, Policy Studies, Inc. ("PSI"), to represent the State in judicial and administrative hearings with regard to child support enforcement proceedings. *Id.* at 895. The public defender's office, along with other public interest organizations, filed motions in court to disqualify PSI and its attorneys based on allegations that PSI was committing the unauthorized practice of law. The Nebraska trial court agreed. *Id.* at 896. Although the State did not appeal these disqualification orders, PSI did. *Id.* at 897. The Nebraska Supreme Court, however, found that PSI had no standing to appeal the disqualification orders because its client, the State, did not wish to pursue an appeal. *Id.* at 897–98. In doing so, the court commented on one aspect of PSI's "interest" in the case:

Although PSI may arguably have an "interest" in making more money, that interest is, at best, peripheral to the real interest at stake in a disqualification proceeding, which is the client's interest in having the attorney of his or her choice.

*Id.* at 898.

Despite Harvey's perception of its significance, we find that this case supports, rather than refutes, the legitimacy of the financial incentives granted to a private company in performing government services. The analysis discounting PSI's pecuniary "interest" occurs in the context of

declining to exercise discretion under § 10–112. Harvey argues that because BCOCSE played a role in objecting, based on its own pecuniary interest, to the forgiveness of his arrearages, it was no different from arrangements, struck down by courts, that create private financial benefits or incentives for the decision-maker. *See, e.g., Ward v. Village of Monroeville,* 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972) (finding violative of the Due Process Clause an arrangement in which a municipal mayor, who had responsibilities related to the raising of revenues, sat also as a judge in traffic citation matters). These cases and their legal reasoning, however, are not applicable to the present matter. As indicated above, the General Assembly believed that certain financial incentives were necessary to fulfill the purpose of the privatization legislation, incentives that were incorporated into private contracts between the CSEA and BCOCSE. In performing most child support responsibilities, however, BCOCSE does not exercise meaningful discretion, but merely performs ministerial acts relating to the enforcement of child support obligations. Although BCOCSE apparently was concerned with its "collection rate" in regard to how it would affect its performance under its contract, such concern was congruent with the aims of the CSEA and the General Assembly, which placed such incentives into the private child support scheme. The litigants in *Ward* were entitled to an impartial judge, expected to make a decision on the merits of the case presented, without regard to the impact on the municipal coffers. In the present case, however, the CSEA was bound, by the Legislature, to exercise its discretion to forgive arrearages only when it was "in the best interest of this State." § 10–112. Although BCOCSE's objections, as well as the CSEA's acquiescence in those objections, were motivated by the pecuniary aims of those entities,

---

the attorney-client relationship, reaffirming that an attorney's financial interest in his or her client's claim is secondary to the client's control over the claim. When a private company's interests are congruent with those of the State, the private company is free to reap the benefits of incentives that the State has offered to achieve those congruent interests.

those aims were also within "the best interest of this State." Thus, by premising BCOCSE's compensation on its "collection rate," the Legislature apparently believed that such an incentive would result in a private company achieving, through more efficient means, the objective inherent in the privatization of child support enforcement: a positive financial impact on the State. In this respect, we find that the CSEA did not act unreasonably in being persuaded that allowing BCOCSE to improve its collection rate was "in the best interest of this State."

<div align="center">3.</div>

Harvey finally argues that it was "arbitrary or capricious" for the CSEA to premise the rejection of his request for forgiveness of arrearages on the technological shortcomings of BCOCSE being unable to factor such a result into its record-keeping system. In recommending that Harvey's request be denied, BCOCSE stated that its computer system was not capable of monitoring Harvey's child support account without triggering automatically certain enforcement provisions, such as the interception of tax refunds. Harvey claims that this is "arbitrary or capricious" because it sacrifices individualized treatment in favor of administrative efficiency. When administrative agencies are faced with a high volume of transactions and accounts, it is not "arbitrary or capricious," as a matter of law, for such agencies to implement an automated or computerized system that emphasizes administrative efficiency at the expense of some degree of individualized treatment. Requests that come before the CSEA and BCOCSE are given individualized treatment, subject to the administrative limitations that have been put in place. By making the all-too-common and arguably necessary decision to install computerized databases and enforcement mechanisms, the CSEA and BCOCSE have not acted in an "arbitrary or capricious" manner, but instead, like many other government agencies and private corporations, have recognized the net benefits of those systems. Nonetheless, we understand Harvey's frustration in this regard.

Harvey states in his brief: "There is nothing in the record that suggests that the current configuration of the computer system is a necessity or that the automated enforcement activities that it generates cannot be overridden in an individual case by a stroke of the keyboard, where circumstances so warrant." Petitioner's Brief at 35 n. 16. Although we recognize that the CSEA's decision to decline forgiveness of Harvey's arrearages may be "arbitrary or capricious" if BCOCSE's computer system was in fact configured to administer the CSEA's proposal effectively, the burden to demonstrate such failure does not fall on the CSEA or BCOCSE. When an individual alleges that an agency's decision is "arbitrary or capricious" based on a factual issue, the burden lies on the individual to provide factual evidence to the court. In this case, Harvey presented no evidence suggesting that the automated system utilized by BCOCSE actually had the capability to implement Harvey's request effectively or that the CSEA or BCOCSE was aware of any method of overriding the noted deficiencies within the existing system.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.

Chief Judge BELL joins in the judgment only.